Terry Joseph KILCOYNE, Petitioner, Appellant,

v.

STATE of Minnesota, Respondent.

No. C2-82-361—C0-83-112.

Supreme Court of Minnesota.

Feb. 17, 1984.

Carol Grant, Cheryl Divine, Meshbesher, Singer & Spence, Ltd., Minneapolis, for appellant.

Hubert H. Humphrey, III, Atty. Gen., St. Paul, Robert Carolan, Dakota Co. Atty., Rick Enga, Asst. Co. Atty., Hastings, for respondent.

AMDAHL, Chief Justice.

This is an appeal by petitioner, Terry Joseph Kilcoyne, from an order of the district court resentencing him pursuant to Minn.Stat. § 590.01, subd. 3 (1982), from three concurrent indeterminate terms of 20 years for three convictions of criminal sexual conduct in the first degree to a determinate Guidelines term of 86 months, which is double the duration of the presumptive sentence of 43 months for the offense in question when committed by a person with defendant's criminal history score of zero. We affirm.

Petitioner was born in 1939, and the victim was born in 1965. The conduct that led to the prosecution and conviction of petitioner began in 1975 shortly after he met the victim's mother at a meeting of an organization of single parents. Petitioner admitted that he used those meetings as a means of meeting women, and claimed to have met anywhere from 300 to 400 women at such meetings over the years.

In 1975, the mother was living with the 10-year-old victim and her two other children in a house in St. Paul. The victim testified that the sexual abuse at defendant's hands began at the St. Paul house. She testified that her mother told her one night that she should sleep in the mother's bed and that petitioner would be coming over. When she woke up petitioner was on one side of her and her mother on the other. After they were naked, petitioner "started intercourse."

One month after meeting petitioner, the mother and the three children, including the victim, moved into one of four apartments over petitioner's place of business, in south Minneapolis. Petitioner continued to sexually abuse the victim there. At first the victim's mother was present on each occasion, with the act occurring in petitioner's bedroom. Within 6 months of the start of the abuse, the victim began experiencing pain in urination. Petitioner told her that she had a disease, syphilis, and that he was going to have to increase the sexual activity. He proceeded to do just that, increasing the frequency of the assaults from once a month to three or four times a month.

Some of these acts occurred in petitioner's bedroom, some on the bed in petitioner's basement darkroom. Petitioner used this darkroom to develop pictures that he took in his photography business, which was but one of his business ventures. Petitioner also used the room as a tattoo parlor. The victim testified that on two or three occasions, starting in 1978, petitioner took instant still photographs of her genitalia in this basement workroom. She also testified that petitioner had a video tape camera on a tripod pointed at the bed in the workroom. She did not know if petitioner ever used the camera to record his sexual activity with her. During a police search

of the workroom in February of 1980, after petitioner's sexual misconduct came to light, police officers observed this camera pointed at the bed. The police never found any tapes of the victim and petitioner, nor did they find any still photographs of the victim.

The victim testified that typically petitioner would begin one of their sessions by examining her vagina "for blisters" evincing her "disease." He then would require her to commit fellatio and would penetrate her vaginally with his penis. Other types of sexual activity included cunnilingus, anal penetration or attempted anal penetration, and breast contact. The victim testified that her mother was present on maybe half of these occasions.

She testified that in 1978, before she started menstruating, petitioner talked about taking her to Texas, marrying her and having a baby with her, then divorcing her. He explained that since the mother no longer could have children, this would be a way for the mother, in a sense, to have one by him. He proposed that the mother and he would keep and raise the child. After the victim began to menstruate, petitioner explained the menstruation to her by saying that she was having miscarriages.

Some time in 1978 the mother and the three children moved to an apartment in a Minneapolis suburb. Petitioner's convictions are based on three instances of sexual assault occurring in that apartment in February, May, and September of 1979. The victim testified that petitioner visited them there only three times that she was aware of and that on each occasion he sexually abused her. She testified that on each of these three occasions petitioner digitally penetrated her vagina to check for syphilis blisters, had sexual contact with her breasts, made her commit fellatio, and required her to submit to vaginal penetration by his penis.

She testified that in October of 1979 she learned that at the end of November they would be moving back to their old apartment over petitioner's place of business. She and the others had visited petitioner there on three or four occasions during their period of residence in the suburban apartment, and on two of these occasions she was sexually abused by petitioner. When she learned that they would be moving back there, she became upset because she knew that it would mean increased sexual contact with petitioner and would mean leaving the friends she had made in the suburb. The victim had told a cousin of hers in southern Minnesota about the abuse back in December of .1976 and he in turn had told his mother, the victim's aunt, but the aunt did not act on the information or report the matter to anyone. This time, however, the victim told the mother of her girlfriend. This woman immediately called the police and they placed the victim in a shelter.

The pediatrician who examined the victim testified that the condition of the victim's vagina was consistent with the history that the victim related to her. She also found that the victim was suffering from a very common venereal disease called trichomoras vaginalis. She testified that a symptom of the disease that women experience is painful urination. The disease is one that is very easily and quickly treated. She felt that the disease was spread only by sexual contact, but another doctor believed otherwise. Petitioner and the victim's mother were tested about 2 weeks later to see if they had the disease. Both tested negatively, but the doctor who tested petitioner testified that it was possible that the test failed to detect it in him. The prosecutor contended that petitioner, having learned of the victim's complaint, had sought and obtained the readily-available treatment which easily could have cured him of the disease in time for the testing 2 weeks later.

Petitioner was formally charged in December of 1979 with two counts of criminal sexual conduct in the first degree and one count of criminal sexual conduct in the second degree for each of the three sexual assaults that occurred in the suburban apartment. Petitioner was charged under subsection (b) of sections 609.342 and 609.-

343, the subsection that applies when the complainant is at least 13 but less than 16 years old and the actor is more than 48 months older and uses his position of authority over her to cause her to submit.

The mother was charged identically and her case came on for trial first, in August of 1980. After she was convicted but before she was sentenced she fled the country and apparently went to France, taking one of her other two children with her. Apparently France will not extradite people charged with offenses of this sort. Petitioner also fled the country and apparently met with the victim's mother in France. Petitioner subsequently returned alone in the fall of 1980, was arrested in Boston, and then was brought to trial here in January of 1981.

The jury found petitioner guilty of all nine charges. The trial court sentenced petitioner to three concurrent 20-year indeterminate prison terms, one for each of the three counts based on penetration of the vagina by the penis, one per episode, and he dismissed the other counts.

Subsequently, petitioner sought resentencing according to the Sentencing Guidelines pursuant to Minn.Stat. § 590.01, subd. 3 (1982). As we indicated, the postconviction court resentenced petitioner to 86 months, double the presumptive sentence duration of 43 months for a severity level VIII offense by a person with a criminal history score of zero. We affirm.

■ One of the main points of dispute is whether in determining the propriety of the departure this court can consider the conduct underlying the three offenses. This case, in our opinion, is a case in which it clearly is proper to consider the conduct underlying the offenses of which petitioner was charged and convicted. *See State v. Brigger,* 316 N.W.2d 512 (Minn.1982); *State v. Rott,* 313 N.W.2d 574 (Minn.1981); *State v. Garcia,* 302 N.W.2d 643 (Minn. 1981). This is because it is clear from a reading of the transcript that the jury believed the testimony of the victim, and the victim's testimony established that the offenses were part of an ongoing scheme or course of conduct with the offenses in question and the prior offenses all being related to each other.

■ Considering the conduct involved and the underlying conduct and making a qualitative assessment of all the facts, we conclude that petitioner's conduct was sufficiently different in degree from the conduct present in the usual or typical case of criminal sexual conduct in the first degree to justify the durational departure. *State v. Luna,* 320 N.W.2d 87 (Minn.1982). This was a case of particularly perverted, especially outrageous ongoing sexual subjugation. The abuse began when the victim was only 10 years old and continued for 4 years. Petitioner's sexual abuse was not only ongoing, but multifaceted. A typical act of abuse consisted of multiple types of penetration. The three 1979 episodes that led to petitioner's convictions were not atypical in this respect. On each of the three occasions petitioner penetrated the victim in three different ways: vaginally with his hand, vaginally with his penis, and orally with his penis. *See State v. Dudrey,* 330 N.W.2d 719, 721 (Minn.1983); *State v. Profit,* 323 N.W.2d 34, 36 (Minn.1982). Petitioner also took pictures of the victim's genitalia. Petitioner's conduct was also cruel. Petitioner led the victim to believe that she was suffering from a serious venereal disease, syphilis, and he also led her to believe she was suffering a series of miscarriages; further, he told her at one point that he was going to marry her, have a baby with her, and then divorce her. The digital vaginal examination that occurred in connection with each of the three episodes showed that petitioner was continuing to psychologically torment the victim in this respect. The record also indicates that petitioner actually transmitted the less serious, easily cured form of veneral disease to the victim, that she experienced pain in urinating as a result, and that she did not receive treatment for it until years after its onset, when the misconduct came to light. The record also demonstrates that petitioner did not just invade the victim sexually but that he in effect destroyed her family.

The record strongly suggests that petitioner was supporting the family in exchange for the sexual favors, and the result of it all is that the victim is totally estranged from her mother and one of her siblings, who no longer even live in this country. Instead of living with her family, the victim has had to live in shelters and with various relatives. In conclusion, the departure clearly was justified.[1]

Affirmed.

1. The state contended at the postconviction hearing that the so-called *Hernandez* method of computing the criminal history score should be used and that by doing so the presumptive sentence would be 65 months, which is the presumptive sentence for the offense in question by a person with a criminal history score of two. The postconviction court refused to do this, reasoning that the *Hernandez* rule could not be used in the case of multiple crimes against one victim. We recently rejected that reasoning in *State v. Moore,* 340 N.W.2d 671 (Minn.1983).