John Albert RAIRDON, Petitioner,
Appellant,

v.

STATE of Minnesota, Respondent.

No. C8–95–2552.

Supreme Court of Minnesota.

Dec. 12, 1996.

Melissa Sheridan, Asst. State Public Defender, St. Paul, for appellant.

Paul R. Kempainen, Asst. Atty. Gen., St. Paul, Waldemar B. Senyk, Otter Tail County Atty., Fergus Falls, for respondent.

## OPINION

GARDEBRING, Justice.

In 1986, appellant John Albert Rairdon pleaded guilty to first- and second-degree intrafamilial sexual abuse, Minn.Stat. §§ 609.3641, subd. 1(2)(e), 609.3642, subd. 1(2)(e) (1984), and was subsequently convicted of first- and second-degree murder, *id.* §§ 609.185(2), 609.19(1). Rairdon now seeks postconviction relief in two forms: reversal of his murder convictions and remand for a new trial, and reduction of his intrafamilial sexual abuse sentences. He argues that his murder convictions were tainted by prosecutorial misconduct and by exclusion of evidence that he believes linked his stepson to the crime. Rairdon also asserts that the circumstances of his sexual misconduct were not so severe as to justify durational departures and consecutive sentencing. The postconviction court denied Rairdon's petition, concluding that any prosecutorial misconduct—which was largely not the subject of objection at trial—was harmless, that the evidence regarding Rairdon's stepson lacked foundation, and that the trial court's stated

grounds for departure were sufficient. The postconviction court noted further that Rairdon's nine-year delay in seeking relief weighed against him. We affirm.

According to the testimony at trial, John Rairdon routinely and habitually sexually abused his daughter, Sarah, once or twice a month from the time she was 6 or 8 years old until shortly before her death at age 13. The sexual abuse mostly involved masturbation of Rairdon by Sarah, but also included vaginal penetration, cunnilingus, and fellatio. Two months before her death, Sarah told her father that she did not want to have sex with him anymore. Their sexual relations ceased, despite Rairdon's continued advances. On May 19, 1985, Rairdon again attempted to convince Sarah to have sex with him, but she refused. The next day, Sarah disappeared.

Sarah was last seen on May 20 near Underwood[1] at about 6:15 p.m., walking east on County Road 122 toward her home, about 4 miles away. Sarah apparently stayed after school, but she declined a ride home because she thought her father would pick her up. Rairdon was employed as a farm tire repairman and he was fixing a tractor tire in a field one and one-half miles south of Underwood until 6:30 p.m., or perhaps later. Rairdon checked out at his place of work, approximately 20 minutes away from the field, at about 7:30 p.m.

Sarah had not returned to her home by 8:00 p.m. when Rairdon arrived home. Marilyn Rairdon (Sarah's stepmother), her daughter Julie, and her 16–year–old son, Jeff Barry, eventually left home to search for Sarah at school, arriving there around 10:00 p.m. Rairdon stayed behind, but then left shortly after Marilyn and returned home shortly after she did. A community effort to find Sarah was organized, in which Rairdon publicly participated.

Sarah's body was found seven weeks later over 20 miles from Fergus Falls on the bank of a dry creek bed where it apparently had been washed from a culvert. The body was mostly decomposed, although a circular hole in the leathered skin of the abdomen was visible, as was a small hole in the front of Sarah's shirt.

Although suspicion originally involved Jeff Barry, Rairdon's stepson, by early August, after police learned that Rairdon had been sexually abusing Sarah, the investigation began to focus on him. He initially admitted to the abuse, but denied killing Sarah; he also said that he could not remember events at the time of her death. In the following days, in a series of interviews with law enforcement and medical personnel, Rairdon said that:

* it was possible that he had killed her;

* that some reflectors near the site of the discovery of the body made him uneasy;

* that if he had killed her, he would have picked her up, tried something, killed her and then disposed of her body when his wife went to look for her;

* that he could have killed Sarah, but he was not sure;

* that a vacant white farmhouse had something to do with the events of the day on which she disappeared;

* that he remembered driving in the area where she would have been walking home from school;

* that he did not kill her, but that his wife and stepson may have helped him dispose of the body;

* that he killed her and that a tire awl in his truck might have blood on it.

On August 14, 1985, a criminal complaint was prepared charging Rairdon with murder and intrafamilial sexual abuse.[2] The com-

---

1. Underwood·is located in Ottertail County about 10 miles east of the City of Fergus Falls. Rairdon worked for a service station in Fergus Falls. Sarah's body was later found approximately 25 miles northwest of Fergus Falls.

2. On August 22, 1985, an Otter Tail County grand jury returned a four-count indictment against Rairdon, charging him with: (1) first-degree murder, Minn.Stat. § 609.185(2) (1984)

(causing the death of another while committing or attempting to commit first- or second-degree criminal sexual conduct with force or violence); (2) second-degree murder, *id.* § 609.19(1) (1984) (causing and intending to effect the death of another, but without premeditation); (3) first-degree intrafamilial sexual abuse, *id.* § 609.3641, subd. 1(2)(e) (1984) (current version at Minn. Stat. § 609.342, subd. 1(h)(iii) (1994)) (multiple acts of sexual penetration over an extended peri-

plaint stated that Rairdon picked up his daughter on May 20 and killed her. Rairdon was given the complaint in his jail cell, and he indicated that it was true to his knowledge. Rairdon also said that he no longer thought that Marilyn or Jeff were involved.[3]

Rairdon's motion for a change of venue was granted on November 1, and the trial was moved to Washington County. Rairdon then pleaded guilty to first- and second-degree intrafamilial sexual abuse on January 27, 1986, and Rairdon's murder trial began the next day.

The state's theory was that Rairdon had picked Sarah up in his truck, taken her to a deserted farmhouse nearby, murdered her, and then returned later in the evening to dispose of her body. The state relied heavily on Rairdon's prior statements to prove that he killed Sarah in a rage of sexual frustration. The state also called two expert forensic witnesses, who testified as to the possible cause of death and the relationship between the hole in Sarah's abdomen and the size of an awl found in Rairdon's tool box. Medical personnel who had interviewed Rairdon before his arrest testified that Rairdon's memory lapses seemed selective and more voluntary than involuntary. Another witness testified that she had seen a Midland Co-op farm tire service truck in the vicinity of a vacant white farmhouse near County Road 122 sometime between 6:00 and 7:00 p.m. on May 20, 1985.[4]

The defense offered alternative theories. A medical examiner testified that holes in Sarah's body were consistent with decomposition, that the hole in Sarah's abdomen was too far lateral to indicate that a major blood vessel was ruptured by a weapon, and that the physical evidence seemed inconclusive regarding the cause of death. A psychiatrist and a psychologist testified that they had not seen evidence that Rairdon was feigning memory loss during psychological examinations.

John Rairdon testified in his own defense, claiming that he could not remember what he did on May 20 between leaving the tire repair job and arriving at his employer's shop in Fergus Falls. Rairdon explained that even though he could not remember killing Sarah, he considered the possibility that he had committed the crime due to police suggestions, his trust in the police officers, and his guilt over the sexual abuse. He claimed that during the investigation he became convinced that he was the killer and created a story that satisfied the officers' demands, but that he later decided he could not plead guilty because he could not remember. He did admit that he had sexually abused Sarah for a period of five years and that, in the months before her death, she had begun to refuse his sexual advances.

After two weeks of testimony, the jury found Rairdon guilty of both murder charges. The court imposed a mandatory life sentence for first-degree murder, a 90–month consecutive sentence for first-degree intrafamilial sexual abuse, and a 50–month consecutive sentence for second-degree intrafamilial sexual abuse.

Rairdon filed a notice of appeal in the court of appeals in June of 1986, but on July 7, 1986, Rairdon's counsel signed a stipulation with the state to dismiss the appeal. The stipulation was filed on July 9, and the court of appeals dismissed the appeal. On April 3, 1995, nine years after his conviction, Rairdon petitioned for postconviction relief. The postconviction court denied Rairdon's petition and the notice of appeal was ultimately transferred to this court.

■ Our review is limited to an examination of whether there is sufficient evidence in the record to sustain the postconviction court's findings. The postconviction court's decision will not be disturbed absent an abuse of discretion. *Scruggs v. State*, 484 N.W.2d 21, 25 (Minn.1992). In the postcon-

---

od of time); and (4) second-degree intrafamilial sexual abuse, *id.* § 609.3642, subd. 1(2)(c) (1984) (current version at Minn.Stat. § 609.343, subd. 1(h)(iii) (1994)) (multiple acts of sexual contact over an extended period of time).

3. Marilyn Rairdon later testified that while she was visiting him in jail that day, Rairdon told her that he "knew" that he killed Sarah.

4. Rairdon was driving a Midland Co-op farm tire service truck during the evening of May 20.

viction court, Rairdon had the burden of proving the facts alleged in his petition by a fair preponderance of the evidence. *See* Minn.Stat. § 590.04, subd. 3 (1994).

## Waiver

As an initial matter, we are asked to consider whether Rairdon has waived his right to consideration of his petition on the merits. We conclude that he has not.

The state argues that Rairdon waived his right to postconviction relief for two reasons. First, Rairdon filed a direct appeal in the court of appeals in 1986, but stipulated to its dismissal. The state relies on *Case v. State*, 364 N.W.2d 797 (Minn.1985), which held that postconviction relief was not available for issues already raised or known on direct appeal, unless the claim would have been so novel that its legal basis was not reasonably available. *Id.* at 799–800. This argument was not raised by the state in its memorandum of law to the postconviction court, and therefore the argument is itself waived. *See Thiele v. Stich*, 425 N.W.2d 580, 582 (Minn. 1988) (explaining that a reviewing court must generally consider only those issues that the record demonstrates have been presented and considered below).

■ But even if the argument may be raised belatedly, we are not prepared to extend the *Case* waiver rule to a petitioner, such as Rairdon, who merely *files* a direct appeal, but whose claims do not receive actual appellate review. On the facts before us, Rairdon's failure to pursue a direct appeal is outweighed by our commitment to convicted defendants' rights to substantive review. *See State v. Knaffla*, 309 Minn. 246, 252, 243 N.W.2d 737, 741 (1976).

■ Second, the state asserts that Rairdon's nine-year delay in obtaining appellate review is sufficient grounds for denying the petition. In general, delay in filing a petition for postconviction relief is one relevant factor against granting relief. *Fox v. State*, 474 N.W.2d 821, 826 (Minn.1991). Although there may be extreme cases in which an excessive delay, without excuse, may alone justify denial of postconviction relief, *see Gaulke v. State*, 296 Minn. 487, 487, 206

N.W.2d 652, 652 (1973) (per curiam) (denying relief based on the petitioner's 25–year delay from the time that the petitioner became aware of newly discovered evidence), we again emphasize that convicted defendants are generally entitled to at least one right of review. *Knaffla*, 309 Minn. at 252, 243 N.W.2d at 741. The postconviction court did not abuse its discretion by considering the merits of Rairdon's petition, while noting that his nine-year delay was one factor weighing against his petition.

## Prosecutorial Misconduct

Rairdon first argues that his murder convictions should be overturned due to prosecutorial misconduct during direct examination of the state's witnesses and cross examination of defense witnesses and also during closing argument. His arguments are based on four types of alleged misconduct. First, he argues that there were improper appeals to the passions and prejudices of the jury; in general, his argument is that the prosecutor repeatedly tried to evoke sympathy for the victim and to arouse the jurors' passions against Rairdon by injecting emotion and bias into the questioning and argument. He bases this position on the prosecutor's closing argument about what happened to Sarah's body in the time before it was discovered, about the "nightmare" of sexual abuse over five years and about what Sarah's friends might have been doing at the time of her murder. There were also questions directed to Rairdon about the victim's birthday, about Rairdon's feelings during the stabbing of his daughter and about whether she called him Daddy when he killed her.

Second, Rairdon argues that there was improper reference to his character. In particular, he relies upon the prosecutor's reference, during closing argument, to Rairdon's own description of himself as a violent man and to his recognition of his own potential to kill. He also directs our attention to questions eliciting a response from a medical witness about "enduring characteristics" of Rairdon's personality, to questions to Rairdon about his own assessment of himself as a violent person and to questions to Marilyn

Rairdon as to whether she was afraid of Rairdon.

Third, he argues that there was an improper interpretation of his guilty plea on the sexual misconduct charges in that the prosecutor said, during closing argument, that Rairdon was leaving clues, wanted to be caught and wanted to be found guilty.

Finally, he identifies an alleged subversion of the standard of proof beyond a reasonable doubt in the prosecutor's request, again during closing argument, that the jury "search for truth."

■ Objections were not raised at trial to most of the alleged instances of prosecutorial misconduct. Failure to object ordinarily forfeits a criminal defendant's right to review, *State v. Coleman,* 373 N.W.2d 777, 783 (Minn.1985), although a defendant may obtain appellate review of and relief from plain errors affecting substantial rights if those errors had the effect of depriving the defendant of a fair trial. *State v. Williams,* 525 N.W.2d 538, 544 (Minn.1994); *State v. Post,* 512 N.W.2d 99, 103–04 (Minn.1994); *see also* Minn.R.Crim.P. 31.02 (1995). That is, the trial error must have been so clear under applicable law at the time of conviction, and so prejudicial to the defendant's right to a fair trial, that the defendant's failure to object—and thereby present the trial court with an opportunity to avoid prejudice—should not forfeit his right to a remedy.

The plain error rule was established before Rairdon's 1986 conviction. *See* Minn. R.Crim.P. 31.02 (1984); *State v. Parker,* 417 N.W.2d 643, 647 (Minn.1988) (reviewing for plain errors seriously affecting substantial rights, and citing *United States v. Young,* 470 U.S. 1, 16–17 n. 14, 105 S.Ct. 1038, 1047 n. 14, 84 L.Ed.2d 1 (1985)); *State v. Gunn,* 299

N.W.2d 137, 138 (Minn.1980) (stating that sufficient error may justify reversal, even without a trial objection). Therefore we reject the state's argument that reversals of convictions based on alleged errors, not the subject of objection at trial, are confined to recent prophylactic efforts by this court. It should be clear, however, that the proper standard for overturning Rairdon's murder convictions is found in precedent existing at the time of his conviction. Insofar as our response to prosecutorial misconduct after that time grew more stringent with our experience and the need for deterrence, *see State v. Merrill,* 428 N.W.2d 361, 372–73 (Minn. 1988) (warning prosecutors of potential reversal due to improper statements in closing arguments "for the last time"), Rairdon may not reap any benefit from such decisions merely because he waited nine years to seek review. By the same token, this opinion should in no way be read to alter our current standards for prosecutorial misconduct and reversal.

That said, certain statements made by the prosecutor during Rairdon's murder trial are troubling. First, the prosecutor may have improperly appealed to the passions and prejudices of the jury by encouraging a conviction based on sympathy for the victim rather than the evidence at trial. *See State v. Plan,* 316 N.W.2d 727, 728 (Minn.1982). The prosecutor asked Rairdon, "Isn't it true that [Sarah] called you 'Daddy' even as you were killing her?" We cannot find—nor has the state identified—any evidentiary basis for this question. It may be that the prosecutor sought to unfairly evoke sympathy for the victim by planting a horrifying but unsubstantiated image in the minds of the jurors.[5]

---

**5.** Because there was no objection at trial, the prosecutor was not compelled to disclose any existing foundation for the question. This case points up the importance of contemporaneous objections at trial. Objections provide the trial court an opportunity to prevent or cure the effects of alleged prosecutorial misconduct, *see State v. Washington,* 521 N.W.2d 35, 40 (Minn. 1994), and enhance a reviewing court's ability to make adequate judgments of whether misconduct has in fact occurred. Failure to object does not relieve the prosecutor's duty to refrain from

misconduct, but it does affect a defendant's ability to obtain a remedy in this court. *See id.*

Rairdon also relies on excerpts from the prosecutor's closing statement to support his argument that the verdict was likely based on passion and prejudice, rather than the evidence. For example, the prosecutor referred to the "nightmare of sexual abuse" suffered by Sarah. No objection was made to these statements either, and in any event we believe that they fell within the prosecutor's prerogative to present an argument not devoid of color. *See State v. Gulbrand-*

■ Second, the prosecutor improperly referred to character evidence in his closing argument. *Cf. State v. Tahash*, 280 Minn. 155, 157, 158 N.W.2d 504, 506 (1968) (stating that a prosecutor may not employ insinuation and innuendo, through questions or elicited answers, to plant in jurors' minds a prejudicial belief in otherwise inadmissible evidence). The prosecutor appeared to urge the jury to conclude that Rairdon had a violent nature and to use that conclusion to infer conduct in conformity with that nature on May 20, 1985:

> It isn't a coincidence, as the defendant indicated, that by his own admission he is a violent man.[6] That is an important consideration. That goes to his personality and the way he deals with stress, the way he deals with frustration, the way he would deal with anger towards Sarah.

■ Third, and finally, the prosecutor made closing arguments that we believe may have improperly interpreted Rairdon's not guilty plea. A prosecutor may not suggest that the defendant did not assert his or her innocence by pleading not guilty. *State v. Jensen*, 308 Minn. 377, 380, 242 N.W.2d 109, 111 (1976) (concluding that it was misconduct to assert that "a plea of not guilty can mean one of two things: It can mean I really didn't do it and I'm really innocent, or it can mean prove it, and every person is entitled to have it proven if they wish, and I submit that is the case here."). Here, the prosecutor argued Rairdon left clues "that he wanted to be used to allow him to be proven guilty without having to face the reality of what he did on May 20th." The prosecutor went on to contend,

> This defendant wants you to find him guilty, just like he wanted the doctors to push the right magical methods to make it real easy for him in August, just like he wanted these investigators to prove it for

him. Remember what he said about that when he was on the witness stand? He said, you know, I am stringing these doctors along, but I was willing to meet those investigators more than halfway. Halfway between what? Halfway between you prove it and I will admit it.

The state has a right to vigorously argue its theory of the case, *State v. Baker*, 280 Minn. 518, 527–28, 160 N.W.2d 240, 245–46 (1968), but the state may not so clearly imply that the defendant's plea is a ruse. We conclude that these statements may have constituted misconduct at the time of Rairdon's conviction.

■ Any improper conduct by the prosecutor in this case, however, was not so prejudicial that the defendant was denied a fair trial. Failure to object or to seek curative jury instructions weighs heavily against granting the remedy of a new trial. *State v. Langley*, 354 N.W.2d 389, 401–02 (Minn. 1984). Rairdon's counsel did neither. Furthermore, powerful evidence of Rairdon's guilt leads us to conclude that Rairdon was not denied a fair trial by the prosecutor's comments. *See id.* (refusing to reverse a murder conviction in light of the defendant's failure to object, and strong, but circumstantial, evidence of guilt). In this case, the evidence against Rairdon was overwhelming. The prosecution not only presented circumstantial evidence of Rairdon's guilt, but, most importantly, the defendant confessed to the crime *several* times before trial. Furthermore, the jury was appropriately instructed regarding the presumption of innocence, proof beyond a reasonable doubt, the meaning of Rairdon's not guilty plea, and the requirement that a verdict must be based on the evidence and not on the arguments or other remarks of the attorneys during trial.[7] After a thorough review of the record, we

---

*sen*, 238 Minn. 508, 511, 57 N.W.2d 419, 422 (1953).

6. During cross examination, Rairdon was asked whether he had a "violent side." After an objection was made and overruled, Rairdon answered in the affirmative. This exchange cannot be taken as an introduction of character evidence by the defense such that the prosecution was allowed to respond in kind. Minn.R.Evid.

404(a)(1) & comment (1989). Nor can Rairdon's out-of-court statements, introduced by the prosecution, be used as the basis for opening the character issue in order to prove conformity on a specific occasion. *See id.*

7. In fact, the trial court explained these principles both before and after the evidence was taken.

conclude that even if Rairdon has identified misconduct plain enough to overcome his failure to object, such misconduct is insufficient to vacate Rairdon's murder convictions when viewed against all the evidence and in the context of the prosecutor's entire closing statement. *See State v. Brown*, 348 N.W.2d 743, 747 (Minn.1984); *State v. Daniels*, 332 N.W.2d 172, 180 (Minn.1983).

■ Rairdon did contemporaneously object to one instance of alleged prosecutorial misconduct relating to character evidence. During the investigation, Rairdon stated that there was a "less-friendly side" to himself. During cross-examination at trial, the prosecutor asked Rairdon if this other side of his personality included more than sexually abusive behavior: "Because there is also a violent side to you, isn't there?" Objection to the question was overruled. Because the question was brief, unrepeated, and not in violation of a court admonition, we are not persuaded that this single question would have constituted prosecutorial misconduct at the time of Rairdon's conviction. *Cf. State v. Harris*, 521 N.W.2d 348, 354 n. 9 (Minn.1994) (noting that such isolated questions, to which objections are made, do not ordinarily constitute misconduct). Even assuming that the prosecutor's question could qualify as misconduct under our 1986 standards, and assuming further that such a question triggers the harmless error standard for federal *constitutional* trial error, *see Yates v. Evatt*, 500 U.S. 391, 402–04, 111 S.Ct. 1884, 1892–93, 114 L.Ed.2d 432 (1991) (explaining the test under *Chapman v. California*, 386 U.S. 18, 21–24, 87 S.Ct. 824, 826–28, 17 L.Ed.2d 705 (1967)), any error was harmless beyond a reasonable doubt for reasons already stated. The evidence against Rairdon was overwhelming—particularly his own confessions—and the jury was well-instructed. After reviewing the record, we are convinced beyond any reasonable doubt that this isolated question, arising within a two-week span of testimony, did not contribute to the jury's verdict.

■ Rairdon also points out that the prosecutor asked one of the medical witnesses about the reliability of the Rorschach ink blot test administered to Rairdon during his psychological examination. In explaining why the Rorschach test was still reliable even though Rairdon had recently been questioned regarding his daughter's death, the witness stated that everyone has personality traits or characteristics that are enduring. When asked if he saw "any of those in the defendant's responses to this test," he added that Rairdon's personality could be described as "emotional," "aggressive," with "poor impulse control" and "a certain element of explosiveness." Rairdon did object on the grounds that the question violated the prosecutor's agreement regarding the scope of psychological testimony, but not contemporaneously. Rairdon's counsel thought it would leave a poor impression to object in the middle of a witness's answer, and he therefore chose to delay his objection. When counsel finally did object, the prosecutor explained that he did not intentionally elicit the witness's comments directed at Rairdon's personality. The trial court asked if Rairdon's counsel wanted the testimony stricken from the record, but Rairdon's counsel rejected this suggestion and moved for a mistrial to preserve the record, believing that any damage could not be rectified. The motion for a mistrial was denied. Under these circumstances, the appropriate standard of review and reversal is plain error. After considering the strength of the evidence against Rairdon, his counsel's deliberate failure to object contemporaneously, and his decision not to pursue a motion to strike, we conclude that the prosecutor's examination of this witness was not so prejudicial that Rairdon is entitled to a new trial. *See State v. Garasha*, 358 N.W.2d 657, 659 (Minn.1984).

For the foregoing reasons, Rairdon's allegations of prosecutorial misconduct are insufficient to warrant the remedy of a new trial, particularly when considered in light of the nine-year delay in raising them.

### Exclusion of Evidence

■ Rairdon also asserts that his murder convictions should be reversed because the trial court excluded evidence that tended to incriminate Jeff Barry, Rairdon's stepson. To generate a reasonable doubt as to the defendant's guilt in a trial for murder, evidence may be submitted tending to show that the crime was committed by a third person

(*e.g.*, evidence of motive, threats, or collateral acts of violence), but only if sufficient foundation is laid. Foundation in this context requires evidence with an inherent tendency to connect the third person with the commission of the crime for which the defendant is charged. *State v. Hawkins,* 260 N.W.2d 150, 155, 158–60 (Minn.1977) (concluding that sufficient foundation existed where the third person testified that he accompanied the defendant to the scene of the crime); *see State v. Wilford,* 408 N.W.2d 577, 579–80 (Minn. 1987) (concluding that foundation was insufficient because no evidence was admitted connecting third persons to the commission of the crime).

At trial, Rairdon's counsel wished to question Jeff Barry regarding sexual contact with Sarah and his whereabouts on May 20. Counsel also intended to question a neighbor's son regarding alleged abuse by Jeff Barry. Rairdon's counsel offered evidence that Jeff was uncooperative during the investigation of Sarah's death, that Jeff Barry was a suspect, and that he may have raped Sarah. Counsel claimed that Jeff Barry had admitted to sexual and other improper contact with Sarah in juvenile court and that a juvenile court petition had been filed against Jeff regarding sexual molestation of another Rairdon child and a neighbor's son.

 We agree with the trial court and the postconviction court that Rairdon's offer lacked foundation under *Hawkins.* Jeff had an uncontroverted alibi. One of the other Rairdon children testified that Jeff was at home with him during the late afternoon and evening of May 20, 1985, and that they ate dinner around 6:00 p.m. or 6:30 p.m. Marilyn Rairdon testified that Jeff then accompanied her to Sarah's school to search for Sarah. Marilyn Rairdon could not account for Jeff's whereabouts for the entire evening, but she testified that he was not absent for any extended period of time. At trial, Rairdon did not rebut this evidence, nor did he offer any other evidence with an inherent tendency to connect Jeff with Sarah's murder.[8] Therefore, the postconviction court did not

abuse its discretion in upholding Rairdon's murder convictions.

### Sentencing

Rairdon also challenges the duration and consecutive nature of his intrafamilial sexual abuse sentences. Departures from the applicable presumptive sentences in the Minnesota Sentencing Guidelines are reviewed for abuse of discretion. *See State v. Lee,* 494 N.W.2d 475, 482 (Minn.1992). However, substantial and compelling circumstances must be present in the record to justify departures. *State v. Garcia,* 302 N.W.2d 643, 647 (Minn.1981); *Williams v. State,* 361 N.W.2d 840, 844 (Minn.1985). A sentencing court should consider whether the defendant's conduct was "significantly more or less serious than that typically involved in the commission of the crime in question." *State v. Back,* 341 N.W.2d 273, 276 (Minn.1983). Rairdon argues that the circumstances of his sexual abuse offenses were not so severe that multiple departures were warranted.

The trial court sentenced Rairdon to 90 months for first-degree and 50 months for second-degree intrafamilial sexual abuse, double the upper limit of the applicable presumptive sentences at that time. Minnesota Sentencing Guidelines IV. & V. (1984) (MSG). The trial court relied on Sarah's vulnerability to justify the departure. *See id.* II.D.2.b(1). The court noted "conflict, turmoil and jealousy" within the family, including hostility from Sarah's stepmother, that prompted Sarah to "look to and reach out to her natural father for refuge and support." According to the trial court, the "particular dependency and trust" placed on Rairdon allowed a double durational departure.

Victim vulnerability is a valid basis for departure if it was a substantial factor in the accomplishment of the crime. *See MSG* II. D.2.b.(1) (stating that departures may be based on particular vulnerability "due to age, infirmity, or reduced physical or mental capacity, which was known or should have been known to the offender"); *State v. Campbell,*

---

8. According to Rairdon's own testimony, his son Adam was also with Jeff during that evening. Moreover, Jeff did not have a driver's license or a car at that time, although Rairdon claimed at trial that Jeff had been seen driving on occasion.

367 N.W.2d 454, 460–61 (Minn.1985) (concluding that vulnerability was a valid factor when the defendant knew or should have known the victim had below-normal mental capabilities, which helped the defendant gain entry to the victim's home); *State v. Gardner*, 328 N.W.2d 159, 162 (Minn.1983). Moreover, violating a position of trust can be an aggravating factor. *Campbell*, 367 N.W.2d at 461; *see State v. Schmit*, 329 N.W.2d 56, 58 (Minn.1983).

The state adds that Rairdon knew that some family members were calling Sarah "slut" and "whore," probably because of the abuse, and therefore the abuse was particularly cruel. Particular cruelty may also justify sentencing departures. *See* MSG II. D.2.b.(2); *State v. O'Brien*, 369 N.W.2d 525, 527 (Minn.1985) (concluding that severe emotional distress was a valid basis for departure in first-degree criminal sexual conduct sentencing); *Kilcoyne v. State*, 344 N.W.2d 394, 397 (Minn.1984) (concluding that the underlying course of conduct may be considered in a departure decision, including psychological torment of a young victim).

The trial court also ordered the two sexual abuse sentences to run consecutively with each other and with Rairdon's mandatory life sentence for murder. Consecutive sentencing for multiple incidents of intrafamilial sexual abuse perpetrated against a single victim also constitutes a departure. *See* MSG II.F. & II.F.06 comment; *State v. Dietz*, 344 N.W.2d 386, 389 (Minn.1984); *State v. Wellman*, 341 N.W.2d 561, 565–66 (Minn.1983). The trial court provided three grounds for consecutive sentences: (1) Sarah's young age (the abuse began at age eight or perhaps younger) and vulnerability; (2) the nature and context of the conduct (60 or more instances of multifaceted abuse, including masturbation, fondling, oral sex, and penetration within a "special dependency relationship"); and (3) the five-year duration of the misconduct, which ended only when Sarah was murdered. The court also concluded that the abuse sentences should run· consecutively with Rairdon's mandatory life sentence for first-degree murder.

We have recognized that circumstances justifying a combined departure that more than doubles a presumptive sentence are extremely rare. *Schmit*, 329 N.W.2d at 58; *State v. Evans*, 311 N.W.2d 481, 483 (Minn. 1981). However, this court has recognized that consecutive sentencing may be combined with a double durational departure when the aggravating circumstances are severe. *Wellman*, 341 N.W.2d at 566; *see also State v. Stumm*, 312 N.W.2d 248, 249 (Minn.1981).

■ We agree with the postconviction court that there was sufficient evidence in the record to support the conclusion that John Rairdon's sexual abuse of Sarah entailed compelling and severe aggravating circumstances. First, the trial court was justified in noting the multiple forms of sexual abuse as a basis for departure. *See Dietz*, 344 N.W.2d at 388–89. There was evidence of vaginal intercourse, fellatio, and cunnilingus. Second, there was evidence in the record to support a finding of particular victim vulnerability and cruelty. Sarah was trapped in a hostile family environment that was fostered by Rairdon's continued abuse and favoritism. *Cf. State· v. Carpenter*, 459 N.W.2d 121, 128 (Minn.1990) (holding that abuse of trust and authority can be valid bases for departure). Third, we find the early initiation of the abuse particularly disturbing. Although the victim's age is generally not allowed to support a departure when age is already an element of the offense, *State v. Brusven*, 327 N.W.2d 591, 593 (Minn. 1982), we have also held that in certain cases the youth of the victim, in conjunction with other factors, may justify a departure. *State v. Cermak*, 344 N.W.2d 833, 839–40 (Minn. 1984). Rairdon's multifaceted abuse of Sarah—which began in habitual fashion when Sarah was eight years old, or younger, and tragically ended only after she resisted her father and was murdered for her courage—was accompanied by severe aggravating circumstances for which greater than double durational departures are reserved.

In the final analysis, determining whether severe aggravating circumstances are present "must be based on our collective, collegial experience in reviewing a large number of criminal appeals from all the judicial districts." *State v. Norton*, 328 N.W.2d 142, 146–47 (Minn.1982). After a qualitative as-

sessment of the record, we are satisfied that the trial court did not abuse its discretion in sentencing Rairdon, nor did the postconviction court abuse its discretion in upholding the sentence.

Affirmed.

BLATZ, J, took no part in the consideration or decision of this case.