**STATE of Minnesota, Respondent,**

v.

**Sergio TURRUBIATES, Jr., Appellant.**

**No. A12–1109.**

Court of Appeals of Minnesota.

May 6, 2013.

174

Lori Swanson, Attorney General, Jennifer Coates, Assistant Attorney General, St. Paul, MN; and David Torgelson, Renville County Attorney, Olivia, MN, for respondent.

David W. Merchant, Chief Appellate Public Defender, Cathryn Middlebrook, Assistant Public Defender, St. Paul, MN, for appellant.

Considered and decided by WORKE, Presiding Judge; KALITOWSKI, Judge; and SCHELLHAS, Judge.

## OPINION

SCHELLHAS, Judge.

Appellant challenges his 240–month upward sentencing departure for second-degree unintentional felony murder while committing felonious child endangerment. We affirm.

## FACTS

In an amended complaint, respondent State of Minnesota charged appellant Sergio Turrubiates with two counts of second-degree unintentional murder while committing a felony in violation of Minn.Stat. § 609.19, subd. 2(1). The state alleged that Turrubiates caused the death of T.M., age 19 months. Count 1 included the underlying felony of first-degree assault in violation of Minn.Stat. § 609.221, subd. 1 (2010); count 2 included the underlying felony of child endangerment in violation of Minn.Stat. § 609.378, subd. 1(b)(1). The state moved for imposition of an upward durational departure of 24 months based on T.M.'s absolute vulnerability, T.M.'s particular vulnerability due to her age, and on Turrubiates's particularly cruel treatment of T.M.

Turrubiates waived his jury-trial rights and pleaded guilty to count 2, based on a plea agreement. He also waived his jury-trial rights on aggravating factors for sentencing. For a factual basis to support his guilty plea, Turrubiates testified that, on

December 22, 2010, he and T.M. were alone in the apartment that he shared with T.M.'s mother and that he was supposed to be watching T.M. while her mother was at work; Turrubiates played with T.M., pulling her around on a rug; T.M. fell off the rug, causing a rug burn on her head; Turrubiates kicked a dresser and an approximately 200–pound television fell off the dresser and hit T.M. on the forehead, causing T.M. to fall backwards and bump the back of her head on a little table; the television fell forward onto T.M.'s chest; Turrubiates picked up the television and observed that T.M.'s eyes were closed and she was stiff; T.M. was having trouble breathing, and Turrubiates could tell that something "serious" was wrong with T.M.; Turrubiates picked up T.M. and laid her in her bed; when Turrubiates carried T.M. to her bed, she was "stiff," "breathing heavy," her eyes were closed, and Turrubiates knew that she was "serious"; Turrubiates paced, panicked, did not know what to do, and sat down and waited for T.M.'s mother to come home from work, which she did seven to ten minutes later; when T.M.'s mother arrived home, Turrubiates told her that T.M. was in her room sleeping; Turrubiates did not tell T.M.'s mother that T.M. "was in some trouble"; Turrubiates and T.M.'s mother watched television, Turrubiates feigned that he had to use the restroom, and called to T.M.'s mother, saying, "I think something's wrong with [T.M.]"; after checking T.M., T.M.'s mother called 911. Turrubiates rode in the ambulance to a hospital and then returned to the apartment. Before the police arrived at the apartment, Turrubiates threw T.M.'s blood-stained clothes into the dumpster "to hide the evidence" and wiped up "a little bit of blood on the wall" in the bedroom, "trying to cover up" what happened. Turrubiates acknowledged that, by not doing anything when he saw T.M. in "that serious state," he put her life in danger, and he admitted that it was "obvious to [him] . . . when [he] saw her, that she was in bad shape."

T.M.'s mother and the assistant medical examiner (AME), who performed T.M.'s autopsy, testified in regard to the state's proposed aggravating factors. T.M.'s mother testified that T.M. was "absolutely dependent on an adult to take care of her and to watch out for her safety." On December 22, 2010, when T.M.'s mother discovered her, she was "throwing up . . . all over" and T.M.'s mother "begged [Turrubiates] in front of the chief of police to tell [her] what was wrong with [T.M.] so they could help her." Turrubiates said that he didn't know. The AME testified that T.M. died on December 24, after being "removed from life support." Her cause of death was "multiple traumatic injuries"—specifically "traumatic head injuries"—and the manner of T.M.'s death was homicide. T.M.'s injuries included a minimum of seven impact sites, including approximately four external impacts and three internal impacts. The AME opined that, even if T.M. hit her head after falling off a rug, was hit by the television, and fell against a table, that scenario would not fully explain some of the impact sites.

The district court found that the state proved the following aggravating factors: T.M. was "absolutely vulnerable," T.M. was particularly vulnerable due to her age of 19 months, and Turrubiates treated T.M. with particular cruelty. The state requested a sentence of 240 months, which included a 24–month upward departure from the top of the presumptive-sentence range of 153–216 months, based on Turrubiates's criminal-history score of 2 and the presence of the aggravating factors. Turrubiates requested a sentence of 153 months, arguing that he has "borderline intellectual functioning" and was remorseful. The district court sentenced Turrubi-

ates to 240 months' imprisonment, based on the aggravating factors. The court reasoned that Turrubiates's conduct was significantly more serious than that typically involved in second-degree unintentional murder while committing child endangerment.

This appeal follows.

## ISSUES

I. Did the district court abuse its discretion by departing upward from the presumptive guidelines sentence for second-degree unintentional felony murder while committing felonious child endangerment based on T.M.'s particular vulnerability due to her infancy and absolute vulnerability?

II. Did the district court abuse its discretion by departing upward from the presumptive guidelines sentence for second-degree unintentional felony murder while committing felonious child endangerment based on Turrubiates's particularly cruel treatment of T.M.?

III. Did the district court fail to properly weigh mitigating factors when sentencing Turrubiates?

## ANALYSIS

We "review the sentence imposed . . . to determine whether the sentence is inconsistent with statutory requirements, unreasonable, inappropriate, excessive, unjustifiably disparate, or not warranted by the findings of fact issued by the district court." Minn.Stat. § 244.11, subd. 2(b) (2010). "A sentence within the sentencing guidelines range is presumed appropriate." *Dillon v. State,* 781 N.W.2d 588, 595 (Minn.App.2010) (citing Minn. Sent. Guidelines II.D (1996)), *review denied* (Minn. July 20, 2010).

We generally review an upward sentencing departure for an abuse of discretion. *Tucker v. State,* 799 N.W.2d 583, 585–86 (Minn.2011). "An upward departure will be reversed if the sentencing court's articulated reasons for the departure are improper or inadequate and the evidence in the record is insufficient to justify the departure." *Id.* at 586 (quotation omitted). "[A] district court may depart from the presumptive guidelines sentencing range only if 'there exist identifiable, substantial, and compelling circumstances to support a sentence outside the range on the grids.'" *Id.* (quoting Minn. Sent. Guidelines II.D.). "Substantial and compelling reasons are those demonstrating that the defendant's conduct in the offense of conviction was *significantly* more or less serious than that typically involved in the commission of the crime in question." *Id.* (quotation omitted).

Here, based on the aggravating factors of T.M.'s particular vulnerability due to her age, T.M.'s absolute vulnerability, and Turrubiates's particularly cruel treatment of T.M., the district court imposed a 24–month upward durational departure from the top of the presumptive guidelines range.

**I. The district court did not abuse its discretion by departing upward from the presumptive guidelines sentence for second-degree unintentional felony murder while committing felonious child endangerment based on T.M.'s particular vulnerability due to her infancy and absolute vulnerability.**

The district court found that T.M. was particularly vulnerable due to her age of 19 months and "absolutely vulnerable" due to her age and "dependen[ce] on adults for all major life functions of self-care includ-

ing communication, feeding, bathing, dressing, and for maintenance of safety." That "[t]he victim was particularly vulnerable due to age, infirmity, or reduced physical or mental capacity, which was known or should have been known to the offender" is an aggravating factor under the sentencing guidelines, on which a district court may base a sentencing departure. Minn. Sent. Guidelines II.D.2.b.(1) (2010). Appellate courts have affirmed upward durational sentencing departures based in part on a victim's vulnerability due to absolute vulnerability and age. *See, e.g., State v. Jones,* 328 N.W.2d 736, 737–38 (Minn.1983) (finding multiple grounds for departure when defendant participated in aggravated robbery of elderly victim and then left injured, helpless victim alone in victim's apartment); *State v. Rohrer,* 317 N.W.2d 700, 700 (Minn.1982) ("[B]ecause of the absolute vulnerability of the victim and the particular cruelty of petitioner in committing the offense, the trial court would have been able to double the sentence duration."); *State v. Mohamed,* 779 N.W.2d 93, 98–99 (Minn.App.2010) (attributing particular vulnerability to victim's infancy), *review denied* (Minn. May 18, 2010); *State v. Beard,* 574 N.W.2d 87, 92 (Minn.App.1998) ("Beard's offense was aggravated by the absolute vulnerability of [the victim] and by Beard's violation of the position of trust conferred on her by [the victim's] parents."), *review denied* (Minn. Apr. 14, 1998).

■ Turrubiates does not challenge the district court's findings that T.M. was particularly vulnerable due to her age of 19 months or absolutely vulnerable. Instead, he argues that the district court's reliance upon the aggravating factor of T.M.'s particular vulnerability due to her age of 19 months was impermissible because T.M.'s age was an element of the felony offense underlying count 2—unintentional felony murder. Turrubiates is correct that age is an element of the felony underlying Turrubiates's second-degree unintentional felony-murder conviction—child endangerment. A "parent, legal guardian, or caretaker" commits felonious child endangerment by "endanger[ing] [a] child's person or health by ... intentionally or recklessly causing or permitting a child to be placed in a situation likely to substantially harm the child's physical, mental, or emotional health or cause the child's death" when "the endangerment results in substantial harm to the child's physical, mental, or emotional health." Minn.Stat. § 609.378, subd. 1(b)(1). And the definition of a "child" applicable to the child-endangerment statute is "any person under the age of 18 years." Minn.Stat. § 609.376, subd. 2 (2010); *see also* Minn.Stat. § 609.376, subd. 1 (2010) (providing that section 609.376's definitions apply to "sections ... 609.376 to 609.38").

■ Turrubiates is also correct that a district court may not base a sentencing departure on the "elements of the underlying crime." *State v. Jones,* 745 N.W.2d 845, 849 (Minn.2008) (quotation omitted). In *Taylor v. State,* the supreme court concluded that a district court improperly imposed an upward durational sentencing departure when it sentenced a defendant for first-degree criminal sexual conduct based on grounds including the age of a child—three years—because the child's age was "already taken into account by the legislature in determining the degree of seriousness of the offense" when the first-degree criminal-sexual-conduct statute required that the complainant be "under 13 years of age." 670 N.W.2d 584, 585–86, 589 (Minn. 2003); *see* Minn.Stat. § 609.342, subd. 1(a) (2002) (requiring complainant in first-degree criminal sexual conduct to be "under 13 years of age").

In *State v. Mohamed*, a case involving malicious punishment of a four-month-old child in violation of Minn.Stat. § 609.377, subd. 1 (2006), this court acknowledged that "[t]he legislature has taken the victim's age into account to the extent that it recognizes the special vulnerability of those under the age of 18." But this court held that, "given the broad spectrum of physical development captured in this 18-year time span, the legislature's recognition does not preclude consideration of the victim's infancy as an aggravating factor here." 779 N.W.2d at 95, 98. This court stated:

> The age element in the statute does not account for the particular vulnerability of [the four-month-old victim], an extremely young victim who, because of his early stage of development, is incapable of perceiving danger, fleeing or shielding himself from harm, seeking help, or reporting the abuse. Indeed, [the victim]'s vulnerability is absolute. He is particularly vulnerable among the broad class of child victims who are covered by the statute.

*Id.; see also Rairdon v. State*, 557 N.W.2d 318, 327 (Minn.1996) ("Although the victim's age is generally not allowed to support a departure when age is already an element of the offense, we have also held that in certain cases the youth of the victim, in conjunction with other factors, may justify a departure." (citation omitted)).

This court rejected Mohamed's argument that the supreme court's *Taylor* opinion precluded consideration of the child's particular vulnerability, noting that "the *Taylor* court concluded that the increase in sentence durations that have been mandated by statute as part of a comprehensive legislative effort to manage sex offenders already reflects the legislature's consideration of the greater vulnerability of a young victim of sexual assault."

*Mohamed*, 779 N.W.2d at 98 (citing *Taylor*, 670 N.W.2d at 589–90). This court construed "[t]he *Taylor* court's conclusion" to be "expressly based on the 'framework of risk management tools' for sex offenders that had been legislatively developed in recent decades" and noted that "[n]o such legislative history or risk-management framework accompanies the malicious-punishment statute at issue here." *Id.* at 98 (quoting *Taylor*, 670 N.W.2d at 589–90). This court concluded that the district court did not abuse its discretion by "relying on the aggravating factor of particular vulnerability of the victim based on the victim's infancy when deciding to depart upward." *Id.* at 100.

Although *Mohamed* involved malicious punishment of a child and this case involves child endangerment, we conclude that the *Mohamed* court's reasoning is applicable to this case. Age is an element common to both cases. *See* Minn.Stat. § 609.376, subd. 1 (providing that section 609.376's definitions apply to "sections ... 609.376 to 609.38," including child-endangerment and malicious-punishment-of-a-child statutes). Both *Mohamed* and this case involve children who were absolutely vulnerable due to their infancy. *Mohamed*, 779 N.W.2d at 98. And, as in *Mohamed*, unlike *Taylor*, the child-endangerment statute applicable in this case is not accompanied by a risk-management framework or legislative history pertaining to sex offenders.

Turrubiates also argues that vulnerability due to T.M.'s age was an improper departure ground because the record does not indicate that Turrubiates did anything to exploit T.M.'s vulnerability due to her age and "nothing about [T.M.'s] age and inability to communicate her medical condition aggravated the offense." We strongly disagree. At the age of 19 months, T.M.'s vulnerability was a sub-

stantial factor in Turrubiates's endangerment of her—T.M. was completely dependent on Turrubiates to properly care for her injury and to seek medical aid—medical aid that might have saved her life. And Turrubiates provides no legal authority to support his argument regarding a lack of exploitation of T.M.'s age.

We conclude that the district court did not abuse its discretion by relying on T.M.'s particular vulnerability due to her infancy and absolute vulnerability as bases on which to depart upward.

**II. The district court did not abuse its discretion by departing upward from the presumptive guidelines sentence for second-degree unintentional felony murder while committing felonious child endangerment based on Turrubiates's particularly cruel treatment of T.M.**

■■ The district court concluded that Turrubiates treated T.M. with particular cruelty. The district court based its conclusion on the AME's testimony that T.M. suffered injuries that included "a skull fracture"; multiple hemorrhages, contusions, and abrasions; and "generalized cerebral edema and congestion." A district court may base a sentencing departure on a defendant's particularly cruel treatment of a victim. Minn. Sent. Guidelines II. D.2.b.(2) (2010) ("The victim was treated with particular cruelty for which the individual offender should be held responsible."). "Particular cruelty involves the gratuitous infliction of pain and cruelty of a kind not usually associated with the commission of the offense in question." *Tucker*, 799 N.W.2d at 586 (quotation omitted). [A]lthough every second-degree unintentional felony murder will undoubtedly involve some degree of cruelty, a district court may use particular cruelty as a basis for departure *only when the cruel-*

*ty associated with the crime for which the defendant was convicted is of a kind not usually associated with the commission of the offense in question.* Short of a finding of this nature, a district court abuses its discretion in imposing an upward departure based on particular cruelty.

*Id.* at 587 (emphasis added) (quotation omitted).

■ Turrubiates argues that the district court erred in deciding that Turrubiates treated T.M. with particular cruelty because it relied on the extent of T.M. injuries, which were "the reason for [T.M.'s] death." We disagree. A district court may evaluate the degree of cruelty inflicted on a child victim based on "the nature and extent of the physical damage and the treatment necessary to repair the injury." *State v. Partlow*, 321 N.W.2d 886, 887 (Minn.1982); *see also Dillon*, 781 N.W.2d at 591–92 ("The particularly cruel conduct of a defendant convicted of assault can be inferred from the nature and extent of injuries inflicted on the victim, supporting an upward durational departure from the presumptive sentence.").

■ Turrubiates argues that the district court erred by relying on the extent of T.M.'s injuries because the injuries resulted from conduct underlying count 1, first-degree assault, which the district court dismissed based on the plea agreement. We disagree. We note that "[d]epartures cannot be based on ... dismissed offenses." *State v. Jones*, 745 N.W.2d 845, 849 (Minn.2008); *see also State v. Womack*, 319 N.W.2d 17, 18 (Minn.1982) ("When a defendant charged with two offenses pleads guilty to one of the offenses on condition that the other will be dismissed, the sentencing court may not, when the allegations of the dismissed offense are in dispute, rely upon those allegations as a ground for aggravating the

sentence."). But we conclude that the district court did not abuse its discretion by aggravating Turrubiates's sentence in part due to his particularly cruel treatment of T.M. Generally, a district court may "consider the conduct underlying the offense of which the defendant is convicted." *State v. Shattuck*, 704 N.W.2d 131, 140 (Minn. 2005). "[F]ailure to aid is relevant to whether a person convicted of a crime has acted in a particularly cruel manner." *Tucker*, 799 N.W.2d at 587; *see State v. Stumm*, 312 N.W.2d 248, 248–49 (Minn. 1981) (affirming departure based on victim's particular vulnerability and defendant's particular cruelty and "indifference to the [two-year-old] child's medical needs after he inflicted the injurious blows that led to the child's death," which the defendant inflicted while babysitting the child).

The supreme court has "never affirmed a departure for particular cruelty based solely on the failure to render medical aid." *Tucker*, 799 N.W.2d at 587. But, here, Turrubiates not only failed to seek medical aid for T.M.; he lied to her doctors about the causes of her injuries, knowing that he was interfering with their ability to save her life. The district court found, and the record supports, that Turrubiates's "failure to seek immediate medical help substantially contributed to the eventual death of" T.M. The AME testified that T.M.'s chances of survival would have increased had she been able to receive more prompt medical treatment and that T.M.'s medical treatment to try to stabilize her was delayed by at least 45 minutes, perhaps an hour or more. Turrubiates admitted that he "realized at the time that [T.M.] became non-responsive that [he] should call 9–1–1 if [he] had any chance of trying to save her" and that T.M. "might actually be dying." And Turrubiates admitted that he "realize[d] at the time by not telling the doctors the truth that [he was] interfering really with their ability to try to treat what was wrong with" T.M.

Turrubiates argues that the district court erred by allegedly implying that Turrubiates *intended* to cause the injuries to T.M., when he pleaded guilty to *unintentional* felony murder. We are not persuaded. The district court found: "All of [T.M.]'s injuries were inflicted while Turrubiates was caring for her. No other person was present and the extent and severity of the injuries was more significant than would have been inflicted if limited to the mechanism of injury that Turrubiates described." The finding is reasonably supported by the record.

We conclude that the district court did not abuse its discretion by relying on Turrubiates's particularly cruel treatment of T.M. as an aggravating factor that justified an upward departure.

### III. The district court did not fail to properly weigh mitigating factors when sentencing Turrubiates.

Turrubiates argues that the district court failed to properly weigh mitigating factors in sentencing him. We disagree. The court considered evidence of Turrubiates's expressed remorse and his lower-than-average cognitive abilities, as reported in his rule 20 evaluation, and Turrubiates provides no legal authority to support his argument that the court was therefore precluded from departing upward on the basis of proper aggravating factors.

"As a general rule, a defendant's remorse bears only on a decision whether or not to depart dispositionally, not on a decision to depart durationally...." *State v. Yang*, 774 N.W.2d 539, 564 (Minn.2009) (quotation omitted). As to Turrubiates's cognitive abilities, the sentencing guidelines permit a district court to consider as

a mitigating factor whether "[t]he offender, because of ... mental impairment, lacked substantial capacity for judgment when the offense was committed" when deciding whether to durationally depart. Minn. Sent. Guidelines II.D.2.a.(3) (2010). But, here, the rule 20 examiner did not believe that Turrubiates's intelligence-test results accurately reflected his ability to function, inferring that Turrubiates did not apply himself during the test.

We conclude that the district court did not abuse its discretion by imposing a 240-month sentence that included a 24–month upward durational departure from the presumptive guidelines sentence.

## DECISION

The district court did not abuse its discretion by relying on the aggravating factors of T.M.'s particular and absolute vulnerability and Turrubiates's particularly cruel treatment of T.M. when departing upward from the presumptive guidelines sentence for second-degree unintentional felony murder, Minn.Stat. § 609.19, subd. 2(1), while committing child endangerment resulting in substantial harm to the child's physical, mental, or emotional health, Minn.Stat. § 609.378, subd. 1(b)(1). The district court did not fail to properly weigh mitigating factors when sentencing Turrubiates.

**Affirmed.**