STATE of Minnesota, petitioner,
Appellant,

v.

George Edward GRILLER, petitioner,
Respondent.

No. C2–96–1665.

Supreme Court of Minnesota.

July 30, 1998.

**738**

Hubert H. Humphrey III, Attorney General, St. Paul, Michael O. Freeman, Hennepin County Attorney, Donna J. Wolfson, Assistant County Attorney, Minneapolis, for Appellant.

John M. Stuart, State Public Defender, Sharon E. Jacks, Assistant Public Defender, Minneapolis, for Respondent.

## OPINION

BLATZ, Chief Justice.

The State of Minnesota appeals from a court of appeals decision reversing the conviction of respondent George Griller for second-degree intentional murder and second-degree felony murder. The court of appeals concluded that the district court did not abuse its discretion in its evidentiary rulings, but held that the district court had given an erroneous instruction on defense-of-dwelling, which entitled him to a new trial. We agree that the district court did not abuse its discretion in its evidentiary rulings, but conclude that Griller is not entitled to a new trial based on the erroneous defense-of-dwelling instruction given. We also conclude that the district court did not abuse its discretion when it departed upward from the presumptive sentence.

In September 1994, the Sioux Falls, South Dakota Sheriff's Department received a letter, asking it to investigate possible financial fraud committed against 94-year-old William Sawyer and the disappearance of Sawyer's brother-in-law, 76-year-old Louis Michael. This investigation ultimately led the police to George Griller, who in the late 1980s began to care for Sawyer and Michael in a house that Griller owned in northeast Minneapolis. While caring for these men, Griller owned a house at 426 Pierce Street and the house immediately behind it at 425 Fillmore Street. Griller stated that Sawyer and Michael lived at the Pierce Street house, while Griller lived part-time at both houses depending on where he was needed. By 1994, however, the Pierce Street house had been sold. Nevertheless, the Sioux Falls police, along with an agent from the Minnesota Bureau of Criminal Apprehension, tracked Griller down at his work in January 1995. When they questioned Griller about Michael's disappearance, he told them that Michael had moved to Chicago.

However, when the police interviewed Griller's Pierce Street neighbors, one neighbor stated that he had seen Griller several years earlier in his backyard digging a hole. The neighbor believed that Griller was burying an elderly person in his backyard. Therefore, the police asked Griller whether he had buried Michael dead or alive, to which Griller responded that he came home one day and found Michael dead in the rocking chair. Griller said that he was shocked by Michael's death and could not afford a funeral, so he buried Michael in the backyard. Griller agreed to show the police where he had buried Michael and took them to an area of the backyard. The police then began to dig in that area.

On the second day of digging, the police unearthed a torso and a set of arm and hand bones that were covered with lime. Anthropologists arrived at the scene and determined that these bones did not come from an elderly man, but rather from a man in his late 20s to early 50s. Later that day, they unearthed the remains of Michael, intact and fully clothed. The excavation continued, and they discovered a human skull and a set of leg and foot bones. Together, the dismembered remains constituted a complete human skeleton.

The police then received a message from Griller asking to speak to them. After the police read Griller his *Miranda* rights, Griller confessed to the killing of James Keen whose dismembered body parts were buried in the Pierce Street house backyard. But Griller claimed that the killing was in defense of himself and Michael.

Keen was a big man, about 6 feet 3 inches tall, weighing between 260 and 270 pounds. According to Griller, Keen was a heavy abuser of crack cocaine and alcohol, and he was taking Antabuse, a medical drug prescribed to help him stop drinking. Griller claimed that Michael had invited Keen to the Pierce Street house, but stated that when Griller walked into the house, Michael was on the floor crying. Griller told Keen to leave, but Keen pushed Griller against the refrigerator, put his hands on Griller's ears, and pushed his thumbs into Griller's eyes. Griller believed that Keen was going to kill him, so he grabbed a hatchet that was laying on the counter and hit Keen on the head. After Keen went to the sink and vomited up blood, he came back at Griller. In defense, Griller grabbed Keen's bottle of whiskey and hit him over the head again.

Griller stated that Michael then took over and told Griller to take Keen's body to the basement. Together, Michael and Griller transported Keen's body to the basement. Subsequently, without Griller's knowledge, Michael cut off Keen's extremities. When Griller discovered this, he and Michael then brought the body parts upstairs to bury in the backyard, and Michael told Griller to put lime on the parts so that the neighbor dogs would not be able to smell the body.

Based on this confession and the bodies found in the backyard of the Pierce Street house, the Hennepin County Attorney charged Griller for the murder of Keen with one count of second-degree intentional murder [1] and one count of second-degree felony murder.[2] Because Michael's cause of death was never determined, Griller was not charged in connection with the death of Michael.

Through discovery, some negative aspects of Griller's life with Sawyer and Michael were revealed, and the district court considered a number of motions regarding the admissibility of these details into evidence. In March 1996, the state filed a letter of intent to introduce such evidence of other crimes and bad acts, including the circumstances of Michael's death and burial; fraudulent financial transactions between Griller and his elderly charges, Sawyer and Michael; and Griller's abandonment of Sawyer.[3] Griller filed a motion to exclude this evidence.

The district court ruled that evidence of Michael's death was "inextricably intertwined" with the crime, that the state could not prove its case without some of the financial information because it explained why the police first contacted Griller, and that the abandonment of Sawyer was "sufficiently intertwined" with the case. Therefore, the court allowed the financial evidence only "to the extent that it is absolutely necessary," and cautioned the state not to use the evidence "to inflame the jury."

The trial lasted for eight days before the case was submitted to the jury. On the following day, the jury returned its verdict, finding Griller guilty of second-degree intentional murder and second-degree felony mur-

---

1. Minn.Stat. § 609.19(1) (1996).

2. Minn.Stat. § 609.19(2) (1990).

3. The state also wished to introduce a number of other bad acts that tended to show Griller's vio-
lent character. The court, however, refused to admit this evidence after concluding that Griller had not put his good character for peacefulness into issue.

der. The state then informed the court that it would seek an upward departure from the presumptive sentence. While the presumptive sentence for second-degree intentional murder is 306 months, the court sentenced Griller to 480 months, the maximum sentence allowed.

Griller appealed, arguing that the district court erred by admitting irrelevant and prejudicial evidence and by giving a misleading and erroneous instruction on defense-of-dwelling. He also contended that the district court abused its discretion by imposing a sentence greater than the presumptive sentence. The court of appeals held that the district court did not abuse its discretion by admitting certain evidence against Griller because the evidence was necessary to explain how the investigation against Griller began. The court of appeals concluded, however, that the district court's jury instruction on defense-of-dwelling was a material misstatement of the law under *State v. Pendleton*,[4] and that the instruction was not harmless. Thus, the court of appeals concluded that Griller was entitled to a new trial. The court did not reach the sentencing issue.

The state petitioned this court for review, contending that Griller was not entitled to a defense-of-dwelling instruction and that the instruction did not substantially affect the verdict. Griller filed a conditional petition for review, arguing that the district court erred by admitting irrelevant and prejudicial evidence and that the district court abused its discretion by imposing a sentence greater than the presumptive sentence. We accepted both petitions for review.

## I.

Griller's primary argument on appeal was that the district court erred when it instructed the jury on defense-of-dwelling. The court of appeals agreed, granting Griller a new trial because the instruction given was in error. The state appeals that ruling.

In its instructions, the district court told the jury that it had to conclude that three factors were present for it to find that the killing was justified because of self-defense or defense-of-dwelling, including that "the killing must have been done in the belief that it was necessary to avert death or great bodily harm." At the time of trial, this appeared to be a correct statement of the law under CRIMJIG 705[5] and *State v. Boyce.*[6] Therefore, the defense did not object to these instructions or request any other instructions, and in closing argument the defense argued that the same three factors applied. At trial, the defense focused only on self-defense and did not address defense-of-dwelling as a separate defense.

Although Griller did not object to the jury instructions at trial, we have the discretion to consider this issue on appeal if it is plain error affecting substantial rights.[7] The United States Supreme Court has established a three-prong test for plain error, requiring that before an appellate court reviews an unobjected-to error, there must be (1) error; (2) that is plain; and (3) the error must affect substantial rights.[8] If these three prongs are met, the appellate court then assesses whether it should address the error to ensure fairness and the integrity of the judicial proceedings.[9]

As the state concedes, the defense-of-dwelling instruction was error. In *State v. Pendleton*, we held that an instruction almost identical to that given at Griller's trial "materially misstated the law" because it required the defendant to show fear of great bodily harm or death, even though the statutory defense requires no such showing for defense-of-dwelling.[10] Thus, the first prong of the plain error test is satisfied.

4. 567 N.W.2d 265 (Minn.1997).

5. 10 Minn. Dist. Judges Ass'n, *Minnesota Practice,* (3d ed.1990).

6. 284 Minn. 242, 253–57, 170 N.W.2d 104, 112–14 (1969).

7. See Minn. R.Crim. P. 31.02.

8. *Johnson v. United States,* 520 U.S. 461, 117 S.Ct. 1544, 1549, 137 L.Ed.2d 718 (1997).

9. *Id.,* 117 S.Ct. at 1550.

10. 567 N.W.2d at 269–70 (citing Minn.Stat. § 609.065).

The state also concedes that the second prong is satisfied under the United States Supreme Court's test set forth in *Johnson v. United States*. [11] In *Johnson,* the Court considered whether the error was plain when at the time of trial the district court correctly stated the law, but later that same law became incorrect based on a case decided during appeal.[12] The Court concluded that to satisfy the second prong it is sufficient that the error is plain at the time of the appeal.[13] Under *Pendleton,* which was released after Griller's conviction and while his case was on appeal, the defense-of-dwelling instruction given is now in error, and thus the error is plain.

■■■■ The third prong, requiring that the error affect substantial rights, is satisfied if the error was prejudicial and affected the outcome of the case.[14] The defendant bears the burden of persuasion on this third prong.[15] We consider this to be a heavy burden. We have defined plain error as prejudicial if there is a "reasonable likelihood that the giving of the instruction in question would have had a significant effect on the verdict of the jury." [16]

■■■■ The state's main argument is that Griller was not in fact entitled to a defense-of-dwelling instruction, and therefore any error in the instruction would not have affected the verdict. Under Minn.Stat. § 609.065 (1996), the intentional taking of another life is justified when it is "necessary in resisting or preventing an offense which the actor reasonably believes exposes the actor or another to great bodily harm or death, or preventing the commission of a felony in the actor's place of abode." The state contends that Griller was not entitled to an instruction under this statute because the Pierce Street house was not Griller's place of abode. This issue was not litigated at trial. There was evidence, however, to support that the Pierce Street house was indeed Griller's place of abode. Griller owned the Pierce Street house, and Griller testified that he lived at both the Pierce Street and Fillmore Street houses, depending on where he was needed. Moreover, Griller's Minnesota identification card listed his address as the Pierce Street house. Therefore, we conclude that Griller was entitled to a defense-of-dwelling instruction.

Nevertheless, the third prong of the test requires that the error have a significant effect on the verdict. In *Pendleton,* we established the three factors the defendant must prove to succeed on defense-of-dwelling:

1. The defendant believed he was preventing the commission of a felony in his home;

2. the defendant's belief was reasonable under the circumstances; and

3. the use of deadly force was reasonable under the circumstances in light of the danger then to be apprehended.[17]

■■■■ Although the burden is on the state to disprove each element, the defendant has the initial burden of presenting evidence to support the claim.[18] To succeed on defense-of-dwelling, the jury would have had to believe Griller's version of events and conclude that his beliefs and actions were reasonable under the circumstances.

Griller's account of the killing was simply not credible. Griller admitted that he knew that Keen was Michael's houseguest. When Griller walked into the Pierce Street house, he saw Michael on the floor, but he did not wait for either Michael or Keen to tell him what was happening before he ordered Keen to leave. Griller admitted that he intentionally killed Keen, but he contended that he killed Keen to protect himself and Michael and to stop the robbery underway. The

11. *Johnson,* 117 S.Ct. at 1549.

12. *Id.*

13. *Id.*

14. *United States v. Olano,* 507 U.S. 725, 734, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

15. *Id.*

16. *State v. Glidden,* 455 N.W.2d 744, 747 (Minn. 1990).

17. 567 N.W.2d at 270.

18. *State v. Graham,* 371 N.W.2d 204, 209 (Minn. 1985).

medical examiner who performed the autopsy, however, testified that Griller's version of events seemed unlikely given the mechanics of the killing revealed by her examination of Keen's bones. Based on the trauma injuries to the head, it is more likely that Griller attacked Keen from behind, which directly contradicts Griller's testimony. Of course, the most incredible part of Griller's story was that, after the killing, Michael—at the time a 72–year–old man who used a walker and who was under Griller's care—took over the situation. According to Griller, this frail elderly man helped Griller carry Keen's approximately 260–pound body down a set of stairs. Then, Michael dismembered the body by himself without Griller's knowledge. Moreover, Griller gave no explanation as to why he did not simply call the police. Griller's story was wholly unbelievable, and therefore it is unlikely that any erroneous instruction significantly affected the verdict.

While we recognize that credibility is an issue for the jury,[19] here the jury clearly rejected Griller's self-defense argument. Given the incredible nature of Griller's testimony, it seems unlikely that the jury would have accepted Griller's argument that he killed to defend his dwelling, even if the elements of fear of death or great bodily harm were absent. If the error in the instruction did not significantly affect the verdict, Griller would not be entitled to a new trial based on the erroneous instruction.

■ However, in this case we need not even reach the issue of prejudice because under Minn. R.Crim. P. 31.02, review of unobjected-to errors is discretionary. Therefore, before granting a new trial on the basis of an unobjected-to error, we will consider whether a new trial is necessary to ensure fairness and the integrity of judicial proceedings.[20] After careful consideration,

we conclude that this is one of those very rare cases where the fairness and integrity of judicial proceedings would be adversely affected if we granted Griller a new trial.

Griller's case is similar to Johnson. There, the Court concluded that a reversal of the defendant's conviction would result in a miscarriage of justice:

■ On this record there is no basis for concluding that the error "seriously affect[ed] the fairness, integrity or public reputation of judicial proceedings." Indeed it would be the reversal of a conviction such as this which would have that effect.[21]

Similarly, here, we conclude that it would be a miscarriage of justice to grant Griller a new trial. Griller was afforded a complete adversarial trial that lasted eight days. During his trial, Griller thoroughly presented his self-defense theory of the case. The jury considered and rejected Griller's far-fetched version of events. Granting Griller a new trial under these circumstances would be an exercise in futility and a waste of judicial resources. Because the integrity of judicial proceedings would be thwarted by granting Griller a new trial, we refrain from granting him this relief on the basis of an erroneous jury instruction.

## II.

■ In Griller's conditional petition for review, he claims that the district court abused its discretion by admitting certain evidence at trial. Griller contests the admission of evidence relating to three areas: (a) Griller's relationship to Michael; (b) events that triggered the investigation of Griller; and (c) circumstances surrounding Michael's death and burial.[22] The district court is given great latitude in its evidentiary rulings. "[R]ulings on evidentiary matters rest within the sound discretion of the trial court," [23] and

19. See State v. Koskela, 536 N.W.2d 625, 630 (Minn.1995).

20. See Johnson, 117 S.Ct. at 1550.

21. Id.

22. This list is a simplified description of the contested evidence. The characterization and list of the contested evidence has changed throughout the course of Griller's case. As the

state claimed at oral argument, Griller seems to contest most of the evidence that was admitted. Nevertheless, all of the contested evidence was objected to at trial, and hearings were held on the admissibility of such evidence.

23. State v. Olkon, 299 N.W.2d 89, 101 (Minn. 1980).

therefore we will only overturn a lower court's evidentiary ruling if that court abused its discretion.[24]

The court of appeals affirmed the admission of the challenged evidence, concluding that the evidence was properly admitted because it explained how the investigation began, it was inextricably intertwined with the state's theory of the case, and the district court cautioned the state to use such evidence only to the extent necessary. We agree.

■ At trial, testimony was admitted that Michael was a vulnerable adult and that Griller controlled all of Michael's assets and accounts. This evidence was relevant and admissible because it tended to show Griller's dominance over Michael, which was key to the state's refutation of Griller's story. Contrary to Griller's contentions, it seems implausible that Michael would have controlled the events, and it seems even more implausible that after killing in self-defense or defense-of-dwelling, one would dismember the body and bury it in one's backyard. Evidence of Griller's control over and domination of Michael was an issue of consequence. Therefore, the district court did not abuse its discretion by ruling that this evidence was relevant under Minn. R. Evid. 401.

■ Minnesota Rule of Evidence 403 would still require excluding this evidence if its probative value was substantially outweighed by the danger of unfair prejudice. But this evidence had significant probative value because it tended to discredit Griller's account of Keen's death. Moreover, the evidence was presented in a "straightforward manner, without an overemphasis on the graphic details."[25] Furthermore, the district court gave a limiting instruction on the use of such evidence, advising the jury that it could convict only on the basis of what was charged in the complaint, namely the killing of Keen, and not for any other wrongs. Thus, the probative value of the evidence was not substantially outweighed by the danger of unfair prejudice.

■ Nor did the district court abuse its discretion in admitting the evidence of the events that triggered the investigation of Griller and the excavation of the backyard at the Pierce Street house. Evidence is admissible to give jurors the context for an investigation. For example, in *State v. Czech*, this court upheld the admission of a defendant's taped statement in which he implicated himself in other crimes, concluding that the whole tape was necessary to give the jury the proper context for the defendant's statement and to reveal to the jury why the police were conducting an undercover investigation.[26] The admission of the evidence here, such as the testimony regarding the letter to the Sioux Falls Sheriff's Department and the police interviews with neighbors, provided the jury with the context necessary to explain how the investigation against Griller began and why the police were excavating the Pierce Street backyard.

■ Likewise, the district court did not abuse its discretion in admitting evidence of the circumstances surrounding Michael's death and burial. As the state points out, such evidence tends to prove Griller's consciousness of guilt, as Michael was the only eyewitness to the killing of Keen. Rather than alerting anyone to Michael's death, Griller chose to hide Michael's body, perhaps to avoid drawing attention to himself or the Pierce Street house. This evidence was admitted to prove Griller's guilty conscience, not to demonstrate that Griller acted in conformity with his bad character.

Finally, we note that when reviewing a district court's decision to admit evidence, it is important that we view the picture presented at trial as a whole. Justice Frankfurter explained the importance of this view: "In reviewing criminal cases, it is particularly important for appellate courts to re-live the whole trial imaginatively and not to extract

**24.** *State v. Edwards,* 485 N.W.2d 911, 914 (Minn. 1992).

**25.** *State v. Harris,* 560 N.W.2d 672, 678 (Minn. 1997).

**26.** 343 N.W.2d 854, 856 (Minn.1984).

from episodes in isolation abstract questions of evidence and procedure."[27] We have conducted a thorough review of the record, and viewing the trial as a whole, we conclude that the district court did not abuse its discretion by admitting the contested evidence.

### III.

Griller's final argument is that the district court abused its discretion by departing from the presumptive sentence for intentional second-degree murder. After the jury returned its guilty verdict, the state requested an upward departure from the presumptive sentence of 306 months. At the sentencing hearing, the court granted the state's request and sentenced Griller to 480 months, the maximum sentence allowed under Minn.Stat. § 609.19 (1990). The court stated, "Frankly, if I could double the sentence I would do so."

 Departures from presumptive sentences are reviewed under an abuse of discretion standard, but there must be "substantial and compelling circumstances" in the record to justify a departure.[28] The district court set forth several reasons for departing from the presumptive sentence: the concealment of Keen's body, the particular cruelty Griller used in killing Keen, and Griller's "chilling lack of remorse" and "persistent attempts to deny responsibility and shift blame." The Minnesota Sentencing Guidelines and precedent support the use of these factors to impose an upward departure.[29] Therefore, we conclude that the district court did not abuse its discretion in departing upward from the presumptive sentence.

In summary, we hold that Griller is not entitled to a new trial because of the erroneous defense-of-dwelling instruction. Moreover, we hold that the district court did not abuse its discretion by admitting the contest-

ed evidence or by departing upward from the presumptive sentence.

Affirmed in part, reversed in part.

---

**27.** *Johnson v. United States*, 318 U.S. 189, 202, 63 S.Ct. 549, 87 L.Ed. 704 (1943) (Frankfurter, J., concurring).

**28.** *Rairdon v. State*, 557 N.W.2d 318, 326 (Minn. 1996).

**29.** *See* Minnesota Sentencing Guidelines II.D.2.b (aggravating factors); *State v. Folkers*, 581 N.W.2d 321 (Minn. 1998) (concealment of body, remorse, and attempt to shift blame); *Rairdon*, 557 N.W.2d at 327 (particular cruelty); *State v. Ming Sen Shiue*, 326 N.W.2d 648, 655 (Minn. 1982) (concealment of body).