**STATE of Minnesota, Respondent,**

v.

**Jason Alexander MacLENNAN, Appellant.**

**No. A03–2048.**

Supreme Court of Minnesota.

Aug. 18, 2005.

222

Office of the MN State Public Defender, Theodora Gaïtas, Assistant State Public Defender, Minneapolis, MN, for Appellant.

Mike Hatch, Minnesota State Attorney General, John B. Galus, Assistant Attorney General, St. Paul, MN, Janelle Kendall, Stearns County Attorney, St. Cloud, MN, for Respondent.

## OPINION

ANDERSON, PAUL H., Justice.

Shortly after midnight on January 14, 2003, Kenneth MacLennan was shot and killed at his home in Saint Cloud, Minnesota. Kenneth's son, 17–year–old Jason Alexander MacLennan, was charged and subsequently indicted by a Stearns County grand jury for the first-degree premeditated murder of his father. Jason Mac-Lennan asked for both a speedy trial and a change of venue, and as a result a jury trial was held in September 2003 in Duluth, Minnesota. MacLennan claimed that he killed his father in self-defense and asked the district court to admit expert testimony regarding battered child syndrome to demonstrate his state of mind at the time of the shooting. The court declined to admit expert testimony on battered child syndrome, but allowed MacLennan to present evidence about his relationship with his father. The jury found MacLennan guilty of first-degree premeditated murder and the lesser-included offense of second-degree murder. The court then convicted MacLennan of first-degree murder and sentenced him to

life in prison. On appeal, MacLennan alleges that (1) the court erred in failing to admit expert testimony on battered child syndrome, and (2) the state committed prosecutorial misconduct during its closing argument. We affirm.

*The Shooting*

Appellant, Jason MacLennan, was the only child of Kenneth and Betty MacLennan. The MacLennan family lived in Florida for most of Jason's childhood, but in late spring 1999, the family moved to Canada to allow Betty to be close to her family during the final months of her battle against breast cancer. Betty died from the disease on July 13, 1999. Shortly after Betty's death, Kenneth and Jason returned to Florida. In the spring of 2002, after accepting a new job, Kenneth relocated from Florida to Saint Cloud, Minnesota, where Jason then joined his father after the 2001–02 school term ended.

Kenneth's job in Saint Cloud required him to travel extensively, which meant that Jason was home alone much of the time. In the late afternoon of Monday, January 13, 2003, Kenneth was scheduled to return home from a business trip to Great Britain. Earlier that day, Jason chose not to go to school; rather, he and several friends gathered at the MacLennan home. Most of the friends had left by 2:00 p.m., around the time when their parents would expect them to return home from school, but Matt Moeller, Jason's closest friend, and Kyle Melberg stayed behind.

Between 2:00 and 2:15 p.m., Jason and Melberg decided to drive separately to the local Outback Steakhouse restaurant, where Jason, Melberg, and Moeller all worked. After Jason and Melberg picked up either their paychecks or tips, they drove around Saint Cloud in Melberg's car. The two eventually made their way to Melberg's home, where they played video games.

Meanwhile, Moeller remained at the MacLennan home. According to Moeller, he stayed at the home in accordance with a plan he and Jason devised to kill Kenneth MacLennan. Moeller had his .22 caliber rifle with him as he waited inside the home for Kenneth to return from his business trip. Moeller testified that the plan was for him to shoot Kenneth when Kenneth entered the home. Moeller waited for Kenneth to arrive until approximately 5:00 p.m., at which point Moeller decided that he was not capable of following through with the plan. Moeller testified that he then took the rifle to his car and drove back to his family's home.

At 5:19 p.m., Jason received a call on his cell phone that originated from his father's cell phone. The state asserts that Jason had expected the voice on the other end of the call to be that of Moeller, confirming Kenneth's death. Instead, the call was from Kenneth, who insisted that Jason return home immediately. Jason then asked Melberg to take him home. While Melberg drove, Jason placed a call to Moeller. According to Moeller, Jason questioned him about his failure to follow through with their plan to kill Kenneth. Jason's testimony differed from that of Moeller on this point. Jason testified that he called to tell Moeller that Kenneth had returned home and to arrange for Jason and Moeller to meet later that evening so that Jason and his father would not have to spend time together.

When Jason and Melberg arrived at the MacLennan home, Jason asked Melberg to accompany him into the home and Melberg agreed. When they entered the home, Kenneth told Jason that he had discovered an empty beer bottle in the home. Kenneth then instructed Jason to retrieve his car from the parking lot at the Outback Steakhouse restaurant and return home immediately. Melberg testified that he

had never met Kenneth before and was unable to discern whether Kenneth's demeanor during this encounter was abnormal. Melberg then took Jason to the restaurant to pick up his car, after which they returned to their respective homes.

After Jason arrived home, he and Kenneth had an argument about the empty beer bottle that Kenneth had discovered. According to Jason, his father degraded and insulted him during the argument. Jason testified that after the argument, Kenneth left to have dinner at a local restaurant and Jason retreated to his bedroom, which was located in the basement.

When Kenneth returned from dinner, he went to the basement to smoke a cigar and play pool. Jason testified that while Kenneth was in the basement, he entered Jason's bedroom, stood by the bed, and began yelling at him. After Kenneth left Jason's room, Jason called Moeller to ask him to sneak out and drive to Jason's home to keep him company. Both boys testified that this was not an unusual request because Moeller frequently sneaked out to visit Jason. Initially Moeller protested, saying that his parents would not allow him to leave, but after some discussion and persuasion from Jason, Moeller agreed to sneak out later that night. According to Moeller, Jason asked him to bring his .22 caliber rifle with him.

Moeller arrived at the MacLennan home at approximately 10:00 p.m. and parked a short distance away from the home. As usual, Moeller entered the home through the basement door, but this time he carried his rifle with him. Jason met Moeller in the basement. Moeller testified that Jason again asked him why he had not carried out the shooting earlier that day, and Moeller responded that he did not want to kill Jason's father. Moeller then slid his rifle under Jason's bed, and the boys left to drive around the city in Moeller's car. According to Moeller, while they were driving, the two of them talked about shooting Kenneth. In contrast, Jason testified that he and Moeller talked about typical teenage things, such as girls, movies, and school.

After a couple of hours, Jason and Moeller drove back to the MacLennan home, and Moeller again parked a short distance away from the home. The boys went inside the home and sat in the living room. After a while, Moeller retrieved his rifle from underneath Jason's bed and brought it up to the living room. The boys then took the rifle up the stairs and approached Kenneth's bedroom where they listened for sounds that would indicate whether Kenneth was awake or asleep. After a few moments, they returned to the living room.

Jason testified that Moeller then dared Jason to take the rifle back up the stairs by himself. When Jason took the rifle up the stairs, Moeller went down to the basement, put on a pair of Jason's boots, walked out of the basement door and around to the front of the home. Moeller then walked up to the front door and rang the doorbell. According to Jason, he could see Moeller through the windows surrounding the front door. Jason testified that he attempted to get Moeller's attention to show Moeller that he had successfully completed the dare, but Moeller rang the doorbell without looking through the front door windows.

Upon hearing the doorbell, Kenneth came out of his bedroom and walked toward the stairway where he saw Jason on the landing with Moeller's rifle. Jason testified that this time he thought his father "was really going to hurt me, and that he wasn't joking anymore." Jason also testified that when Kenneth "started coming at me, I was just so scared. * * * I was afraid that he was going to hurt me,

that I didn't know what he was going to do to me." Jason testified further that he shot his father "[j]ust to protect myself and get out of that room—to get away from him." According to Jason's testimony, he did not recall the number of times that he shot his father. Forensic evidence presented at trial revealed that Jason shot Kenneth six times.

After the shooting, Jason went downstairs and opened the front door to let Moeller into the home. Moeller testified that he did not see any of the events before or during the shooting because he did not look through the front door windows. Moeller testified that when he entered the home he picked up shell casings from the shooting. While Moeller picked up the shell casings, Jason put on a glove and ransacked Kenneth's bedroom. Jason also took Kenneth's wallet and watch from the room. According to Moeller, Jason took these actions to make it appear as though an intruder had shot Kenneth.

Before Jason and Moeller left the MacLennan home, they went to Jason's bedroom so that Jason could select a change of clothes. They then walked to Moeller's car and drove to the Moeller family cabin, which was approximately 10 to 15 minutes from the MacLennan home. At the cabin, Moeller showed Jason a swamp-like area where Jason disposed of Kenneth's wallet and watch and the clothes that Jason was wearing during the shooting. Moeller kept his rifle in his car. Jason and Moeller then drove back to the MacLennan home. Jason testified that Moeller asked him to wait a few minutes before he called the police because this time delay would allow Moeller time to drive home and sneak back into his bedroom. Jason took a shower while Moeller drove home. When Moeller arrived home, he took his rifle with him into his bedroom and attempted to alter the interior barrel of the

rifle with an allen wrench in order to prevent the rifle from being connected with the bullets used to shoot Kenneth.

Jason called 911 after he got out of the shower. The police arrived within minutes and asked Jason about the shooting. Jason told the officers that he did not know how or why his father had been shot, and also that both he and his father routinely left the front door unlocked, thus implying that an intruder must have been responsible for the shooting. At trial, Jason testified that he lied to the police officers because he feared they would not believe that he shot his father in self-defense.

Shortly after beginning the investigation, the police took Jason and Moeller into custody and charged them with Kenneth's murder. Moeller pleaded guilty to second-degree intentional murder. Jason was certified to be tried as an adult and indicted by a grand jury for first-degree premeditated murder and second-degree intentional murder. Jason pleaded not guilty and asserted that he killed his father in self-defense. In support of his claim of self-defense, Jason sought to admit expert testimony on battered child syndrome to explain the ill effects of his father's emotional abuse and the potential effect that such abuse might have on his perception of fear. Jason then made an offer of proof on the dynamics of the MacLennan family relationships and the need for expert testimony on battered child syndrome.

*The Relationships within the MacLennan Family*

Before trial, Jason made an offer of proof to demonstrate the basis of his claim that Kenneth severely emotionally abused him. The offer of proof included potential testimony from Jason's family in Canada, as well as testimony from friends and neighbors from Florida. All of the witnesses were prepared to testify about the

relationships between Kenneth and Betty, between Jason and Betty, and between Jason and Kenneth.

The testimony offered to demonstrate the type of relationship that Kenneth and Betty had during their marriage related primarily to allegations that Kenneth both physically and sexually abused Betty. One of Betty's friends from Florida was prepared to testify that Betty confided in her about Kenneth's abusive behavior and his insatiable desire for sex. Betty's sister, Lillian Barker, was also prepared to testify that Betty confided in her about Kenneth's abusive behavior. The testimony about Kenneth and Betty's relationship was offered to support Jason's testimony about the abusive nature of his parents' relationship.

Jason's friends and family were willing to testify about the relationship between Jason and Kenneth, both while Betty was alive and after her death. Several of Jason's neighbors from Florida were prepared to testify that Kenneth neglected Jason. They would have testified that during Betty's two-year treatment for breast cancer, which included two mastectomies and radiation therapy, Kenneth remained in Switzerland while Jason was left alone to serve as Betty's primary caretaker. In particular, Jason's former girlfriend, Molly Harris, was willing to testify that Jason had difficulty staying awake at school and paying attention in class because he expended so much energy caring for his mother. Other friends were also willing to testify about Jason's care and concern for his mother during her illness.

The proffered testimony about the relationship between Jason and his father focused primarily on Jason's fear of his father and his father's bad temper. The parents of one of Jason's friends were willing to testify about at least two instances when they observed a distinct change in Jason's demeanor when he was in Kenneth's presence. According to them, Jason would go to great lengths to avoid being alone with Kenneth, and when in Kenneth's presence, Jason was uncharacteristically docile and hypersensitive.

With respect to Kenneth's temper, a close colleague and tennis partner of Kenneth's was prepared to testify that Kenneth had a short temper and a strong dissatisfaction with his son. Jason's aunt, Lillian Barker, was also prepared to testify about her own experience with Kenneth's anger and emotional abusiveness that occurred when she visited Jason and Kenneth in Florida after Betty's death. The testimony of Jason's friends and family was offered to support his self-defense claim and as the basis for his request for expert testimony on battered child syndrome.

*Expert Testimony on Battered Child Syndrome*

Jason sought to offer expert testimony on battered child syndrome to describe how battered child syndrome might explain his actual fear for his personal safety at the time of the shooting. In response to Jason's request, the district court determined that the expert testimony would need to be presented at a *Frye–Mack* hearing before trial because battered child syndrome presented a novel scientific theory in Minnesota.[1]

---

1. Dr. C. Henry Kempe first described the concept of "battered child syndrome" in 1962. *State v. Smullen,* 380 Md. 233, 844 A.2d 429, 445 (2004) (citing C. Henry Kempe et al., *The Battered Child Syndrome,* 181 JAMA 105 (1962)). Dr. Kempe described battered child syndrome as "a clinical condition in young children who have received serious physical abuse, generally from a parent or foster parent." *Smullen,* 844 A.2d at 445–46. It was this detailed analysis of the physical and psychological impact of recurrent abuse on chil-

At the *Frye–Mack* hearing, Jason offered the testimony of Dr. Michael Arambula, a clinical psychiatrist with a specialty in forensic psychiatry. Dr. Arambula testified that battered child syndrome is a term that initially was used by physicians to describe the existence of physical evidence of abuse in children, but the term has evolved to encompass the psychological symptoms suffered by children who have been battered. According to Dr. Arambula, few children who suffer from battered child syndrome actually attack their abusers. But Dr. Arambula testified that when a child with battered child syndrome does attack his abuser, the attack generally does not occur at the time of the conflict; rather, it occurs when the child has the opportunity to attack. According to Dr. Arambula, in the rare instance when a child attacks his parent/abuser, the attack will usually involve excessive force because the child is unable to control his or her emotions.

To rebut Dr. Arambula's testimony, the state called Drs. Carl Malmquist and Susan Phipps–Yonas. Dr. Malmquist is a clinical psychiatrist with specialties in forensic and child psychiatry. According to Dr. Malmquist, battered child syndrome is generally accepted as a medical diagnosis used by physicians to show that a young child has been physically or sexually abused. But according to Dr. Malmquist, in the psychiatric community battered child syndrome is a developing theory about the potential psychological reactions that children may suffer as a result of abuse. Dr. Malmquist stated that in the psychiatric community battered child syndrome "is not, at this point, well tested and

confirmed enough to gain credibility that there is such an accepted syndrome." Dr. Malmquist also testified that it is not proper to correlate the psychological effects of abuse on children to the psychological effects on women in abusive intimate relationships because there are any number of variables that control how women and children will react to abuse.

The testimony of Dr. Phipps–Yonas was consistent with that of Dr. Malmquist. Dr. Phipps–Yonas described battered child syndrome as a diagnostic tool of physicians used to detect the presence of physical or sexual abuse in very young children. According to Dr. Phipps–Yonas, it is improper to correlate the effect of abuse on children to the effect of abuse on women because the reactions of battered children "are all over the board," based on any number of factors. Dr. Phipps–Yonas did acknowledge that battered woman syndrome is generally accepted in the psychiatric and psychological community. According to Dr. Phipps–Yonas, battered woman syndrome is generally accepted because it has been shown that battered women experience a specific set of symptoms of post-traumatic stress disorder. But Dr. Phipps–Yonas testified that such a set of symptoms has not been shown in battered children at a sufficient rate of occurrence to support the same general acceptance in the community that battered woman syndrome enjoys.

After hearing the expert testimony, the district court concluded that Jason had not met his burden under the *Frye–Mack* standard. The court's decision was based upon the failure of Dr. Arambula's testimo-

---

dren that led many states to pass mandatory reporting legislation. Merrilee R. Goodwin, *Parricide: States are Beginning to Recognize that Abused Children Who Kill Their Parents Should be Afforded the Right to Assert a Claim of Self–Defense*, 25 Sw. U. L. Rev. 429, 435

(1996). In Minnesota, we accepted Dr. Kempe's formulation of battered child syndrome for use in the prosecution of physical and sexual child abuse cases. *See State v. Loss*, 295 Minn. 271, 204 N.W.2d 404 (1973).

ny to demonstrate general acceptance of battered child syndrome in the psychiatric and psychological communities and the insufficiency of the evidence offered to demonstrate that Jason suffered severe emotional abuse. Although the court did not allow expert testimony on battered child syndrome at trial, it permitted Jason to offer evidence of his relationship with his father. The only testimony permitted at trial about the relationship between Betty and Kenneth was Jason's own testimony about his parents' relationship.

### The Trial

The trial began on September 8, 2003, in Duluth. During the course of trial, the district court allowed evidence to be admitted about the relationship between Jason and Kenneth. Much of Jason's direct testimony was about his relationship with both his mother and father. Jason testified that his parents slept in separate bedrooms, on opposite sides of their home. He testified that after arguments between his mother and father, his mother would retreat to his room and sleep on the floor at the foot of his bed or near the bedroom door. Jason also testified that during his parents' arguments, he could hear his mother being physically abused by his father. Jason never reported that his father abused his mother, and he did not tell any of his friends, neighbors, or family members about the situation at home.

During his testimony, Jason described the relationship with his father as being "verbally" abusive and distant. Jason testified that his father physically abused him once when he was in tenth grade. According to Jason, when his father caught Jason smoking a cigarette, he took the cigarette and used it to burn Jason's arm, but Jason did not report this incident to anyone. Jason also testified that during an argument he had with his father in the kitchen of their Florida home, his father grabbed a kitchen knife, held it at his side, and used it to threaten Jason.

The district court permitted Jason to call his aunt Lillian Barker to testify about her encounter with Kenneth when she visited Jason and Kenneth in Florida after Betty's death. Barker testified that Kenneth became irate with her because money was missing from the home and because she opened a bottle of Kenneth's wine without his permission during Barker's dinner with a friend. According to Barker, she was so distraught by the incident that she spent the remainder of her visit with a friend in the neighborhood, and then returned to her home in Canada.

Several of Jason's friends also testified about the relationship between Jason and Kenneth. Molly Harris stated that she witnessed several arguments during which Kenneth berated and degraded Jason. Molly's parents, Paul and Debra Harris, testified about several incidents when Jason appeared to be fearful of his father. In one case, according to Mr. Harris, Jason stayed at the Harris home past his curfew, but was too afraid to call home and pleaded with Mr. Harris to call Kenneth for him. Startled by Jason's reaction, Mr. Harris agreed to make the call. Mrs. Harris testified that Jason would often come to the Harris home distraught and sullen after arguments with Kenneth. Both Mrs. Harris and Molly testified about an incident when Jason attempted to commit suicide in their home. According to Mrs. Harris and Molly, Jason attempted to smother himself with a pillow, but Molly called for her mother's help and Mrs. Harris was able to stop Jason's suicide attempt. None of the witnesses who testified on Jason's behalf recalled that Jason had ever expressed an interest in either killing Kenneth or in obtaining any of his inheritance from Kenneth.

Jason testified that his relationship with his father became even more strained when a woman from Switzerland, Laurence Morand, moved into their Florida home in November 1999. According to Jason, Kenneth initially introduced Morand as Jason's nanny, but Jason subsequently became aware that Morand was in fact Kenneth's girlfriend. They had met and began dating while Kenneth was living and working in Switzerland. According to Jason, he and Kenneth argued because Jason disliked Morand and felt that she was attempting to replace his mother.

To rebut the testimony of Jason's witnesses, the state offered Morand's testimony about the interactions between Jason and Kenneth that she observed while living with them in Florida between November 1999 and the summer of 2002. Because of Kenneth's frequent business travel, Jason was often left at home either alone or with Morand. According to Morand, both Kenneth and Jason had terrible tempers and argued often. However, Morand testified that she never thought that Jason was afraid of his father, because Jason was willing to shout back at Kenneth during their arguments.

The state also offered testimony from Jason's friends in Saint Cloud. In contrast to the testimony of Jason's friends from Florida, his friends from Saint Cloud testified that Jason frequently discussed a desire to have his father killed and that Jason would make frequent remarks about the amount of money he would inherit when his father died. Moeller and another friend testified that Jason often encouraged them to help him obtain a handgun. Jason's friends from Saint Cloud also testified that they thought Jason was joking about killing his father and never took his words or actions seriously.

During closing argument, the state frequently referred to the shooting as either a "premeditated ambush execution," an "ambush execution," or an "execution." Although Jason did not object to these statements during the trial, on appeal he asserts that these statements constitute prosecutorial misconduct and are sufficient grounds for reversal. Throughout its case, the state painted a vivid picture of Jason as a spoiled child who saw his good fortune slipping away as he neared his eighteenth birthday. The state asserted that Jason was a child who sought to immediately reap the reward of his million-dollar inheritance by killing his father. The state made the following statement to the jury during closing argument about Jason's self-defense claim:

> [Jason] had to come up with something new. So he told you of a story that he thought no one could refute.
>
> Abuse. Mom is gone. Dad isn't here to defend himself. Maybe Laurence [Morand] can't get back into the country. I will say I was defending myself. And, if nothing else, maybe the jury will feel sorry for me. Maybe if I can make my dad look bad enough, they will agree with me that my dad deserved to die. That is a defense; isn't it? Yeah, I killed him. It was a good idea. He deserved it.
>
> Self-defense? * * * To believe that, folks, you are going to have to ignore the evidence. And to call that self-defense, you are going to have to ignore the law.

Jason alleges that both the improper description of his self-defense claim and the inappropriate characterization of the shooting unfairly prejudiced the jury against him.

The jury found Jason MacLennan (hereinafter "MacLennan") guilty of first-degree premeditated murder and the lesser-included offense of second-degree intentional murder. The district court convict-

ed MacLennan of first-degree premeditated murder and sentenced him to life in prison. On appeal MacLennan raises two issues: (1) whether the court committed error when it excluded expert testimony on battered child syndrome, and (2) whether the state's comments during closing argument constitute prosecutorial misconduct sufficient to warrant the reversal of MacLennan's conviction.

## I.

The admissibility of expert testimony on battered child syndrome offered to prove an element of self-defense is an issue of first impression for our court. The proper standard to apply in assessing the admissibility of novel scientific evidence is the *Frye–Mack* standard. *See State v. Mack*, 292 N.W.2d 764 (Minn. 1980). We recently reaffirmed our adherence to the *Frye–Mack* standard in *Goeb v. Tharaldson*, 615 N.W.2d 800, 813–14 (Minn.2000). Under the *Frye–Mack* standard, a novel scientific theory may be admitted if two requirements are satisfied. *Goeb*, 615 N.W.2d at 814. The district court must first determine whether the novel scientific evidence offered is generally accepted in the relevant scientific community. *Id.* Second, the court must deter-

mine whether the novel scientific evidence offered is shown to have foundational reliability. *Id.* As with all expert testimony, the evidence must comply with Minn. R. Evid. Rules 402 and 702; that is, it must be relevant, helpful to the trier of fact, and given by a witness qualified as an expert. *Goeb*, 615 N.W.2d at 814. The proponent of the novel scientific evidence bears the burden of establishing the proper foundation for the admissibility of the evidence. *Id.* at 816.

As an initial matter, we must determine whether the *Frye–Mack* standard is the proper standard to apply to the expert testimony on battered child syndrome offered in this case. Admittedly, on appeal both parties framed the issue of the admissibility of the evidence about battered child syndrome in terms of the *Frye–Mack* standard.[2] Nonetheless, while we have previously applied *Frye–Mack* to evidence falling into the general field of psychology, we have not applied *Frye–Mack* in cases addressing the admissibility of "syndrome" evidence offered to explain behavior.[3] In *State v. Kraushaar*, we specifically declined to decide "whether expert psychological evidence should be scrutinized under the *Frye* standard." 470 N.W.2d 509, 513 (Minn.1991).

2. At the district court, MacLennan directly argued that a *Frye–Mack* analysis was not required. On appeal, he only notes that *Frye–Mack* is "clumsy in the context of social science evidence" and that in cases involving social science theory this court "has expressed more concern about the helpfulness of the proffered testimony than the quantum of empirical data supporting the theory."

3. *State v. Borchardt*, 478 N.W.2d 757 (Minn. 1991) (concluding that the trial court did not abuse its discretion in excluding expert testimony of "male sexual victimization"). *Compare Mack*, 292 N.W.2d at 768 (applying *Frye* to hypnotically-induced testimony), and *State v. Anderson*, 379 N.W.2d 70, 79 (Minn.1985) (applying *Frye* and excluding the results of a

personality assessment), *with State v. Hennum*, 441 N.W.2d 793 (Minn.1989) (holding that expert testimony on battered woman syndrome is admissible); *State v. Hall*, 406 N.W.2d 503 (Minn.1987) (holding that the trial court did not abuse its discretion in admitting expert testimony concerning the behavioral characteristics typically displayed by adolescent victims of sexual assault); *State v. Myers*, 359 N.W.2d 604 (Minn.1984) (holding that expert testimony about the emotional and psychological characteristics often observed in children who are victims of sexual abuse was admissible); *State v. Saldana*, 324 N.W.2d 227 (Minn.1982) (holding that expert testimony on rape trauma syndrome was inadmissible).

In previous cases, we have addressed the admissibility of "syndrome" evidence under Minn. R. Evid. 702 without citing the *Frye–Mack* standard. For example, in *State v. Hennum,* we addressed whether expert testimony on battered woman syndrome was admissible in the context of the defendant's claim of self-defense. 441 N.W.2d 793, 797–99 (Minn.1989). In holding that expert testimony regarding the general characteristics of battered woman syndrome was admissible, we did not use the *Frye–Mack* standard. *Id.* Instead, we analyzed whether the evidence met the "helpfulness" test under Rule 702. *Id.* at 798. By applying Rule 702 and declining to use the *Frye–Mack* standard, we concluded that the expert testimony was admissible because it would be helpful to the jury by explaining "a phenomenon not within the understanding of an ordinary lay person." *Id.* at 798.

A review of decisions from other courts indicates that some state courts have applied *Frye* to "social science evidence" such as battered child syndrome without addressing the applicability of the test. *See, e.g., Smullen,* 844 A.2d at 448; *State v. Janes,* 121 Wash.2d 220, 850 P.2d 495, 501–03 (1993). Some other state courts have specifically addressed whether *Frye* is the appropriate standard and have held that *Frye* is not applicable to social science evidence that offers an explanation for behavior. *See People v. Beckley,* 434 Mich. 691, 456 N.W.2d 391, 403–04 (1990) (holding that when the purpose of behavioral science evidence is to offer an explanation for certain behavior, the *Frye* test is inapplicable); *People v. Harlan,* 222 Cal. App.3d 439, 449, 271 Cal.Rptr. 653 (Cal. App.1990) (holding that the *Frye* standard does not apply to an expert's opinion on

children's reaction to molestation when her opinion was based on her clinical experience with child sexual abuse victims and her familiarity with professional literature in the area); *State v. Borrelli,* 227 Conn. 153, 629 A.2d 1105, 1111 (1993) (concluding that satisfaction of the *Frye* test is not a necessary precondition for the admission of expert testimony on battered woman's syndrome); *State v. McCoy,* 179 W.Va. 223, 366 S.E.2d 731, 736 n. 9 (1988) (stating that *Frye* does not govern the admissibility of rape trauma syndrome testimony); *People v. Hampton,* 746 P.2d 947, 950–52 (Colo.1987) (holding that the rules of evidence, not *Frye,* govern the admissibility of expert testimony on rape trauma syndrome).[4] We find the foregoing opinions from our sister states on the application of *Frye* to syndrome evidence to be informative.

The analysis adopted by the Michigan Supreme Court in *Beckley* provides some basic guidance on how courts should approach battered child syndrome evidence. 456 N.W.2d at 403–04. In *Beckley,* the Michigan court held that the *Frye* test does not apply to behavioral science evidence and recognized that there is "a fundamental difference between techniques and procedures based on chemical, biological, or other physical sciences as contrasted with theories and assumptions that are based on the behavioral sciences." *Id.* at 404. *Beckley* involved a consolidated appeal of two child sexual abuse cases in which experts testified regarding the circumstances and patterns of behavior typically exhibited by sexually abused children. The Michigan court explained that the concerns underlying its continued use of the *Frye* test for scientific evidence were not present when considering social

---

4. At the time *Hampton* was decided, Colorado used the *Frye* standard. Subsequent to *Hampton,* Colorado adopted the *Daubert* rule for all expert scientific testimony. *See People v. Shreck,* 22 P.3d 68, 77 (Colo.2001).

science evidence.[5] Specifically, that court stated that:

> The ultimate testimony received on syndrome evidence is really only an opinion of the expert based on collective clinical observations of a class of victims. Further, the issues and the testimony solicited from experts is not so complicated that jurors will not be able to understand the "technical" details. The experts in each case are merely outlining probable responses to a traumatic event. It is clearly within the realm of all human experience to expect that a person would react to a traumatic event and that such reactions would not be consistent or predictable in all persons.

*Beckley,* 456 N.W.2d at 404. Thus, the Michigan court held that the *Frye* test is inapplicable to such evidence "so long as the purpose of the evidence is merely to offer an explanation for certain behavior." *Id.*

The Connecticut Supreme Court has also decided a case that provides us with guidance on the proper method for determining the admissibility of social science evidence. *Borrelli,* 629 A.2d at 1110–11. As part of its case in chief in *Borrelli,* the state, in order to impeach the victim's subsequent changed testimony, presented an expert witness on battered woman syndrome to provide an explanation for the victim's recantation of an earlier statement about the abuse she suffered from her husband. *Id.* at 1110. In response, the defendant, who was the alleged abuser, argued that battered woman syndrome did not meet the *Frye* test requirements for admissibility. *Id.* The Connecticut court disagreed with the defendant and held that "satisfaction of the *Frye* test is not a necessary precondition for the admission of expert testimony on battered woman's syndrome." *Id.*

In its holding, the Connecticut Supreme Court noted that the *Frye* test is "appropriate when the experimental, mechanical or theoretical nature of the scientific evidence ha[s] the potential to mislead lay jurors awed by an aura of mystic infallibility surrounding scientific techniques, experts and the fancy devices employed." *Id.* (citation omitted). The court continued, stating that "expert testimony need not satisfy the *Frye* test in cases where the jury is in a position to weigh the probative value of the testimony without abandoning common sense and sacrificing independent judgment to the expert's assertions based on his special skill or knowledge." *Id.* (internal quotations omitted). The court further stated that "where understanding of the method is accessible to the jury, and not dependent on familiarity with highly technical or obscure scientific theories, the expert's qualifications, and the logical bases of his opinions and conclusions can be effectively challenged by cross-examination and rebuttal evidence." *Id.* (citation omitted). Finally, and of critical importance in light of our opinion in *Hennum,* the Connecticut court noted that the state offered the expert testimony not to present an opinion that the victim was indeed a battered woman, but "in order to provide an interpretation of the facts that a lay jury might not have perceived because of its lack of experience with battered women." *Id.*

■ The reasoning in *Beckley* and *Borrelli* is helpful in deciding the instant case because the Michigan and Connecticut courts made an important distinction between scientific evidence derived from a

---

**5.** Like Minnesota, the Michigan court has affirmed the validity of the *Frye* test, as opposed to the *Daubert* standard, for determining the admissibility of novel scientific evidence. *Beckley,* 456 N.W.2d at 403.

specific test or diagnosis and expert testimony that offers an explanation for a person's behavior. *Beckley,* 456 N.W.2d at 404; *Borrelli,* 629 A.2d at 1111; *see also People v. Stoll,* 49 Cal.3d 1136, 265 Cal. Rptr. 111, 783 P.2d 698, 710 (1989). The requirements of the *Frye–Mack* standard support such a distinction. A *Frye–Mack* analysis requires both general acceptance in the relevant scientific community and foundational reliability. *Goeb,* 615 N.W.2d at 810. To establish foundational reliability, the proponent of the novel scientific evidence is required to show that the evidence sought to be admitted was derived from a scientific test that is reliable and was administered in a manner that conformed to the procedure necessary to ensure reliability. *Id.* at 814.

■ Unlike a case involving physical science such as DNA testing, in the area of "syndromes" experts do not administer a specific set of tests to discern whether a defendant suffers from either battered woman syndrome or battered child syndrome. Further, such experts may not testify about whether a particular defendant actually suffers from a syndrome. *See Hennum,* 441 N.W.2d at 799. Rather, experts on "syndromes"—including battered child syndrome—are only permitted to testify about the syndrome in a general manner, provided that the testimony is "helpful" to the jury. *See id.* Thus, expert testimony on syndromes, unlike DNA evidence or other physical science, is not the type of evidence that the analytic framework established by *Frye–Mack* was designed to address. Accordingly, we conclude that the *Frye–Mack* standard does not govern the admissibility of expert testimony on battered child syndrome.

## II.

■ Because we have concluded that the *Frye–Mack* analytic framework is not suitable to battered child syndrome evidence, we must determine how courts are to determine the admissibility of this evidence. We conclude that courts should use Minn. R. Evid. 702 to discern whether this evidence would be helpful to the jury. *See Hennum,* 441 N.W.2d at 798–99. Under Rule 702, "[i]f scientific, technical or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." In discussing Rule 702, we have stated that:

> The basic requirement of Rule 702 is the helpfulness requirement. If the subject of the testimony is within the knowledge and experience of a lay jury and the testimony of the expert will not add precision or depth to the jury's ability to reach conclusions about that subject which is within their experience, then the testimony does not meet the helpfulness test. In determining admissibility, of course, the trial court also may rely on those considerations expressed in Minn. R. Evid. 403. Thus, the court may exclude the testimony if the court concludes that it will confuse the jury. Needless to say, the trial court has broad discretion in deciding whether testimony by a qualified expert should be received.

*State v. Helterbridle,* 301 N.W.2d 545, 547 (Minn.1980).

Our holding in *Hennum* supports our conclusion. In *Hennum,* we relied on Rule 702 when we concluded that expert testimony on battered woman syndrome would "help to explain a phenomenon not within the understanding of an ordinary lay person." 441 N.W.2d at 798. In *Hennum,* we joined many other states that had previously grappled with the issue of the

value and purpose of battered woman syndrome evidence. *See id.* Ultimately, we agreed with a majority of other jurisdictions that expert testimony on battered woman syndrome can help jurors understand the interpersonal dynamics involved in abusive relationships, something with which many jurors are unfamiliar. *Id.* In doing so, we acknowledged that the purposes for which other courts allowed testimony on battered woman syndrome were: (1) to dispel the common misconception that a normal or reasonable person would not remain in such an abusive relationship, (2) for the specific purpose of bolstering the defendant's position and lending credibility to her version of the facts, and (3) to show the reasonableness of the defendant's fear that she was in imminent peril of death or serious bodily injury. *See id.*

While acknowledging the value of battered woman syndrome evidence in *Hennum*, we did not allow its unfettered admission. Rather, we stated that expert testimony on battered woman syndrome should be limited "to a description of the general syndrome and the characteristics which are present in an individual suffering from the syndrome." *Id.* at 799. Experts would not be allowed to testify to the ultimate fact that the particular defendant actually suffers from the syndrome because this determination should be left to the trier of fact. *Id.* Finally, in addition to allowing general testimony by experts on the syndrome, we stated that each party could call witnesses to "testify to characteristics possessed by the defendant which are consistent with those found in someone suffering from battered woman syndrome." *Id.*

■ There is no reason why our reasoning and analysis in *Hennum* should not apply with equal force to battered child syndrome. Like expert testimony on battered woman syndrome, we conclude that expert testimony on battered child syndrome may help to explain a phenomenon not within the understanding of an ordinary lay person. Within the framework of Rules 402 and 702, relevant evidence that helps explain the characteristics possessed by children who have been battered and outlines the probable responses to traumatic events would be allowed. *See Beckley*, 456 N.W.2d at 400–02. Such evidence, like battered woman syndrome evidence, would be helpful to jurors struggling to discern whether elements of charged crimes have been met.

■■ As we did in *Hennum*, we limit expert testimony on battered child syndrome to a description of the general syndrome and the characteristics which are present in an individual suffering from the syndrome. *See Hennum*, 441 N.W.2d at 799. Each party may call witnesses to testify about characteristics possessed by the defendant that are consistent with those found in someone suffering from battered child syndrome. *See id.* But experts may not testify to the ultimate fact that the particular defendant suffers from battered child syndrome. *See id.* Our conclusion preserves our interest in allowing the jury to serve as fact finders, with the role of determining whether a particular defendant suffers from battered child syndrome, and does not allow that role to be usurped by experts. Therefore, we hold that the district court erred in analyzing MacLennan's battered child syndrome expert evidence under the *Frye–Mack* standard.

Finally, we note that by concluding that expert testimony regarding battered child syndrome maybe helpful to the trier of fact, we join several other state courts taking a similar position. *See In re Appeal in Maricopa County*, 182 Ariz. 60, 893 P.2d 60, 62–63 (Ct.App.1994); *Smullen*, 844 A.2d at 445–50; *State v. Hines*, 303

N.J.Super. 311, 696 A.2d 780, 786 (App. Div.1997); *State v. Nemeth,* 82 Ohio St.3d 202, 694 N.E.2d 1332, 1341 (1998); *Janes,* 850 P.2d at 503; *see also Perryman v. State,* 990 P.2d 900, 904 (Okla.Crim.App. 1999).

### III.

 Having held that the district court erred, we now must determine whether the court committed reversible error. When the admissibility of evidence is challenged on appeal, we defer to the district court's exercise of discretion in the conduct of the trial, and we will not lightly overturn a district court's evidentiary ruling. *State v. Koskela,* 536 N.W.2d 625, 629 (Minn.1995). On review, the offer of proof submitted by MacLennan and evaluated by the district court does not support the admission of the expert testimony on battered child syndrome. All evidence, including expert testimony, may be admitted only if it is relevant. Minn. R. Evid. 402. In this case, the offer of proof submitted by MacLennan did not establish the relevance of the expert testimony on battered child syndrome to MacLennan's claim of self-defense. MacLennan's offer of proof demonstrated a tense relationship between him and his father, but there was little demonstrable evidence of the type of relationship described by MacLennan's own expert that would give rise to battered child syndrome. Therefore, we conclude that MacLennan did not meet his burden of establishing the relevance of the expert testimony on battered child syndrome to his claim of self-defense. Accordingly, we hold that, even though the district court applied the wrong standard, the court did not err when it excluded the proffered expert testimony on battered child syndrome.

### IV.

 MacLennan also asserts that he is entitled to a new trial because of prosecutorial misconduct committed by the state during its closing argument. We note that while MacLennan now raises prosecutorial misconduct as a ground for reversal, he did not object to the alleged misconduct during the course of his trial. When a defendant alleges error for the first time on appeal, we apply the plain error standard of review. *State v. Griller,* 583 N.W.2d 736, 740 (Minn.1998); *see Johnson v. U.S.,* 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). When assessing whether plain error occurred, we must determine whether (1) there was error, (2) the error was plain, and (3) the error affected the defendant's substantial rights. *Griller,* 583 N.W.2d at 740 (citing *Johnson,* 520 U.S. at 466–67, 117 S.Ct. 1544). If these three requirements are satisfied, the appellate court may correct the error only if the error "seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings." *State v. Crowsbreast,* 629 N.W.2d 433, 437 (Minn.2001) (quoting *Johnson,* 520 U.S. at 467, 117 S.Ct. 1544).

The specific conduct that MacLennan challenges consists of statements made by the state throughout the course of its closing argument. First, MacLennan challenges the state's description of the shooting of his father as a "premeditated ambush execution," an "ambush execution," or an "execution." MacLennan asserts that the state's description of the shooting in this manner was calculated to appeal to the passions and prejudices of the jury.

 We have consistently held that a "'prosecutor must avoid inflaming the jury's passions and prejudices against the defendant.'" *State v. Ashby,* 567 N.W.2d 21, 27 (Minn.1997) (quoting *State v. Porter,* 526 N.W.2d 359, 363 (Minn.1995)). In our

view, the foregoing statements made by the state during its closing argument were dramatic characterizations of the shooting. Nevertheless, we are dissuaded from MacLennan's position because the evidence admitted at trial supported the state's characterization of the murder. Although we do not condone the state's choice of language, we conclude that its characterization of the murder was not error.

 Second, MacLennan asserts that the state committed prosecutorial misconduct during the course of its closing argument by referring to his self-defense claim as an "abuse excuse." It is well-settled that the state has a right to vigorously argue its case, *Rairdon v. State*, 557 N.W.2d 318, 324 (Minn.1996), but the state may not denigrate a particular type of defense, *Ashby*, 567 N.W.2d at 28. As part of the state's right to vigorously argue its case, it may specifically argue that there is no merit to the particular defense, but it may not belittle the defense, either in the abstract or by suggesting that the defendant raised the defense because it was the only defense that may be successful. *State v. Griese*, 565 N.W.2d 419, 428 (Minn.1997) (quoting *State v. Williams*, 525 N.W.2d 538, 549 (Minn.1994)).

 We conclude that when the state characterized MacLennan's motivations for raising a defense of self-defense, it took unnecessary liberties that were not supported by the evidence. This conduct went beyond the scope of the state's right to vigorously argue its case. Thus, the state's denigration of MacLennan's chosen defense was error and it was plain.

 Having concluded that the state plainly erred in its denigration of MacLennan's chosen defense, we must also consider whether that error affected his substantial rights. *See Griller*, 583 N.W.2d at 740–41. In order to show that the error has affected his substantial rights, the defendant must show that the error was prejudicial and that it affected the outcome of the case. *Id.* at 741. We consider this to be a heavy burden. *Id.* Error is prejudicial if there is a reasonable likelihood that the absence of the misconduct in question "would have had a significant effect on the verdict of the jury." *Id.* (citing *State v. Glidden*, 455 N.W.2d 744, 747 (Minn.1990)).

 After reviewing the evidence submitted at trial, we conclude that the jury would have reached the same verdict even if the prosecutor had not denigrated MacLennan's defense. The state introduced overwhelming evidence that MacLennan had planned to murder his father and that MacLennan killed his father in accordance with the plan. The state's evidence showed that MacLennan lured his father out of the bedroom and shot him at least six times with a .22 caliber rifle. MacLennan then took several steps to cover up the crime, including ransacking his father's bedroom and disposing of his bloodied clothes near the Moeller family's cabin. The state's evidence also showed that when police officers questioned MacLennan about the murder, he continued to conceal the crime by lying to the police officers about what had occurred that night. Furthermore, the district court permitted MacLennan to present considerable evidence in support of his self-defense claim, including details about the tumultuous relationship between him and his father. We conclude that, in light of the evidence presented at trial, the state's characterization of MacLennan's self-defense claim did not have a substantial impact on the jury's verdict and did not affect MacLennan's substantial rights. Accordingly, we hold that MacLennan is not entitled to a new trial.

Affirmed.

PAGE, Justice (concurring).

Battered child syndrome as defined by the defense expert requires, in the first instance, a showing that the child was physically abused. As described by the state's experts, a showing of either physical or sexual abuse of the child is required. Courts around the country that have addressed battered child syndrome as a defense also describe the syndrome as requiring physical or sexual abuse. *State v. Smullen*, 380 Md. 233, 844 A.2d 429, 450 (2004); *State v. Nemeth*, 82 Ohio St.3d 202, 694 N.E.2d 1332, 1335 (1998); *State v. Janes*, 121 Wash.2d 220, 850 P.2d 495, 501 (1993); *Perryman v. State*, 990 P.2d 900, 904 (Okla.Crim.App.1999); *State v. Hines*, 303 N.J.Super. 311, 696 A.2d 780, 785–86 (App.Div.1997); *see also In re Appeal in Maricopa County*, 182 Ariz. 60, 893 P.2d 60, 63 (Ct.App.1994). Absent allegations of the requisite physical or sexual abuse, there can be no prima facia showing that a child suffers from the syndrome. Here, the record does not contain the requisite allegations of either physical or sexual abuse. Therefore, there was no basis for the admission of any battered child syndrome evidence. Because there was no basis for the admission of any of the battered child syndrome evidence, I would leave for another day both the question of whether this court should formally recognize battered child syndrome as a defense and, if recognized, what method is to be employed by the trial court in analyzing the admission of expert testimony on the syndrome.

ANDERSON, G. BARRY, Justice (concurring).

Because I conclude that the expert testimony on battered child syndrome was properly excluded by the district court, regardless of what standard the district court employed or should have employed to evaluate that expert testimony, I concur with the result reached by the majority opinion. I would leave for another day whether this court should formally recognize battered child syndrome.