*This opinion will be unpublished and
may not be cited except as provided by
Minn. Stat. § 480A.08, subd. 3 (2014).*

**STATE OF MINNESOTA
IN COURT OF APPEALS
A14-1723**

State of Minnesota,
Respondent,

vs.

Sunil Vidyadhar Sapatnekar,
Appellant.

**Filed August 31, 2015
Affirmed
Ross, Judge**

McLeod County District Court
File No. 43-CR-13-843

Lori Swanson, Attorney General, St. Paul, Minnesota; and

Michael K. Junge, McLeod County Attorney, Elizabeth Smith, Assistant County
Attorney, Glencoe, Minnesota (for respondent)

Cathryn Middlebrook, Chief Appellate Public Defender, Steven P. Russett, Assistant
Public Defender, St. Paul, Minnesota (for appellant)

        Considered and decided by Johnson, Presiding Judge; Ross, Judge; and Willis,

Judge.*

---

* Retired judge of the Minnesota Court of Appeals, serving by appointment pursuant to
Minn. Const. art. VI, § 10.

UNPUBLISHED OPINION

**ROSS**, Judge

A McLeod County jury found Sunil Sapatnekar guilty of taking, using, or transferring grain valued at more than $5,000 after grain belonging to local farmers disappeared from a grain elevator that Sapatnekar exclusively controlled. Sapatnekar appeals, arguing that the state did not offer sufficient evidence to prove that he stole the grain. He also argues that the district court improperly sentenced him. Because sufficient evidence proved the theft and the district court properly sentenced Sapatnekar, we affirm.

**FACTS**

Sunil Sapatnekar owned a controlling interest in and was a director of Winsted Farmers Elevator from 1998 until the middle of 2011. The elevator purchased and stored corn, oats, and soybeans for resale, and it also operated a grain bank, storing grain for local farmers who paid monthly fees. Farmers owned the grain they stored at the elevator; they could withdraw their grain or direct the elevator to act as their agent to sell the grain on their behalf.

In early January 2011, the elevator contained 41,286 bushels of corn, of which 17,551 bushels belonged to farmers. An independent audit confirmed that the recorded and actual amounts matched. But by May of that year, all the grain, including all the corn, was gone. Farmers reported to police that their stored grain was missing and that the elevator had not paid them for grain it sold on their behalf. After a lengthy investigation, the state charged Sapatnekar in May 2013 with theft of property exceeding $5,000 under Minnesota Statutes section 609.52, subdivisions 2(1) and 3(2) (2010).

The district court administered Sapatnekar's jury trial in 2014. Ten farmers testified that their grain was removed from the elevator without their permission. They lost 9,677 bushels of grain, including at least 3,478 bushels of corn. A thousand bushels of corn was worth between $5,000 and $6,000. Another farmer testified that the elevator lost his corn valued at $1,800. Four farmers testified that the elevator also sold 1,937 bushels of their grain with permission but kept the sale money. Two other farmers also testified that the elevator sold their grain but kept the $22,356 proceeds. No evidence contradicted this testimony.

The state offered no direct evidence of Sapatnekar's independent physical access to the grain. The elevator's storage bins were locked, and Sapatnekar did not keep his own key. The state argued that Sapatnekar committed theft in two ways. It maintained that he stole the grain being stored by the farmers by shipping grain from the elevator after he knew that the only grain remaining belonged to them. And it maintained that he committed theft by selling the farmers' grain at their request while never intending to pay them.

Much of the trial focused on Sapatnekar's dominant control of the company, his knowledge of the elevator's accounting, his instructions to subordinates, and his diversion of funds from the corporation. The state elicited most of this evidence from company managers Richard Klosowski and William Graham.

Klosowski managed the elevator for about ten years. He testified that when he began in 2000, the elevator's board had already ceded its governing authority to Sapatnekar. By the time of the 2014 trial, the board had not met in five years. Klosowski

announced his intention to resign in August 2010 after he refused to follow Sapatnekar's instruction to sell beans that the farmers owned. Sapatnekar accused Klosowski of insubordination and told him not to return.

Sapatnekar promoted Graham to replace Klosowski. Graham had worked for the elevator since the 1970s, mostly as a trucker. Immunized from prosecution in exchange for his testimony, Graham told the jury that, beginning in January 2011, Sapatnekar met with him at least weekly and almost every time told him to "ship more grain" despite its apparent depletion. Graham saw that the grain was rapidly diminishing and that the bins were mostly empty. But he followed Sapatnekar's instructions. Graham knew that some of the grain he shipped belonged to the farmers.

Sapatnekar testified in his own defense. He admitted that he directed Graham to sell grain in early 2011. He said that it was a good time to sell grain because the elevator was "gathering a fair amount" and prices were rising. He denied specifically telling Graham to ship grain that was not owned by the elevator.

The evidence showed that Graham prepared monthly grain inventory sheets and that Sapatnekar always saw them. Sapatnekar sometimes helped Graham calculate the amounts on these inventory sheets. Graham, who had no accounting experience or background, explained that Sapatnekar always adjusted Graham's figures but never explained why. Graham's documented inventory for December 2010 matches a January 5, 2011 physical audit. According to both sources, the elevator was storing 17,551 bushels of the farmers' corn and 23,734 bushels of the elevator's corn. But the next month's inventory sheet shows that while the farmers' grain bank still consisted of

4

17,348 bushels of corn, the elevator's store had fallen to a mere 445 bushels. The February inventory sheet represents that the farmers' grain bank had dropped only slightly to 17,073 bushels and that the elevator's store had risen to 3,782 bushels. The March inventory represents that the farmers' grain bank still had 14,080 bushels but that the elevator's own supply had fallen to *negative* 6,933 bushels. According to the April inventory, even though the elevator had none of its own corn, it supposedly shipped 2,625 bushels of elevator corn, ending the month with an even greater deficit of the elevator's store.

The state offered evidence tending to show that Sapatnekar controlled the elevator's finances. It also showed that he ordered the sale of grain ostensibly with the farmers' permission but without intending to deliver to them the sale proceeds. Sapatnekar took exclusive control over the elevator's checkbook around April 2010. Graham and the elevator's bookkeeper, Stephanie Erickson, both told Sapatnekar that farmers must be paid, but he refused.

The farmers began complaining to the state in early 2011. The department of agriculture revoked the elevator's buyer's license "due to non-payment of grain to producers." During this same period Sapatnekar transferred over $86,000 from the elevator to three companies that he owned. These companies, Buffalo Quality Feeds, B&B Pallets, and Bjorkland Trucking, in turn transferred more than $40,000 to him personally. Sapatnekar admitted to police that none of these companies was actually operational. Erickson testified that she never saw any invoice suggesting that the elevator owed any funds to any of these businesses, and she explained that B&B Pallets actually

owed the elevator money. Graham testified that, if the elevator had actually incurred any obligation to pay B&B Pallets, it would have been a very small obligation. He speculated that B&B Pallets might have supplied pallets to use for delivery of calcium or barn lime, but even if so, the cost of pallets used in an entire truckload would have amounted to no more than about $280.

The court instructed the jury, explaining that it could find Sapatnekar guilty of the theft charge if he intentionally took, used, or transferred grain, knowing that it belonged to others and that he did not have the owners' consent, intending to deprive the owners permanently of the grain. The instructions also directed the jury to enter a guilty verdict only if it found that the aggregate value of the grain illegally taken, used, or transferred by Sapatnekar exceeded $5,000.

The jury found Sapatnekar guilty, and the district court sentenced him to a 360-day jail term, of which 300 days were stayed on probationary conditions. The state objected to this misdemeanor sentence, arguing for the presumptive probationary felony sentence of 366 days instead. The district court resentenced Sapatnekar to 366 days in prison, again stayed, and it ordered him to pay $50,761.93 in restitution.

Sapatnekar appeals.

## D E C I S I O N

## I

Sapatnekar argues on appeal that the record does not support his conviction of grain theft because evidence that he kept the proceeds of grain sales does not prove that

6

he stole the grain itself and because no evidence establishes that he knowingly sold grain that belonged to farmers. Neither argument convinces us.

***The state proved Sapatnekar intentionally took, used, or transferred the farmers' grain.***

Sapatnekar emphasizes that the jury instructions identify grain, not money, as the allegedly stolen property. He argues that the evidence of his retention of funds that he was obligated to repay the farmers for the grain sales does not prove that he stole the grain itself. The argument is not compelling.

The instructions, consistent with the theft statute, permitted the jury to find theft based on Sapatnekar's taking, use, or transfer of farmers' grain without their consent and with intent to deprive them personally. *See* Minn. Stat. § 609.52, subd. 2(1). Sapatnekar is correct that the district court's instructions gave the jury a basis to find guilt only for theft of grain. And he is correct that some of the farmers had—for some part of the grain—indeed given Sapatnekar permission to sell the grain as their agent. But this does not establish that he was wrongly convicted for stealing grain. Under Sapatnekar's theory, a retail clerk who sells a company's merchandise out the back door and pockets the cash is not really stealing the merchandise because the owner generally authorized the clerk to sell the merchandise. We think instead that when an owner permits another to sell her goods in order to benefit the owner, the permitted seller does not avoid a theft-of-goods conviction based on that permission if he makes the sale actually intending not to benefit the owner but to benefit himself. The farmers never authorized Sapatnekar to use their grain to enrich himself. The sales in this case constitute either the use or the transfer of the goods in a manner for which the offender lacks actual permission or consent.

7

Rather than intending to benefit the owner, the sales were made intending to deprive the owner. The jury had sufficient evidence to find that Sapatnekar intentionally took, used, or transferred the grain in a way that the farmers never intended and that this intent developed before he transferred the grain. The instructions could have been more broadly written to include theft of sale proceeds, but we are satisfied that even in their narrow construction they adequately cover both Sapatnekar's taking of grain that the farmers intended to continue storing and his use or transfer of grain that they had allowed him to sell for their benefit.

### The state proved that Sapatnekar knew he was selling grain belonging to the farmers.

Sapatnekar argues that no evidence indicates that he was ever aware that the elevator had run out of its own grain and was shipping grain that belonged to farmers. We uphold a conviction in the face of a sufficiency-of-the-evidence challenge if the evidence, considered in a light most favorable to the guilty verdict, would allow a reasonable fact finder to find the defendant guilty beyond a reasonable doubt. *State v. Thomas*, 590 N.W.2d 755, 757–58 (Minn. 1999). Graham's January 2011 inventory informed Sapatnekar that the elevator possessed very little of its own grain and that, by March 2011, it held none of its own grain. Sapatnekar not only viewed these inventory figures, he also personally tinkered with them. Sapatneker continued to order Graham to ship grain that clearly belonged to the farmers and not to the elevator. The corn that Sapatneker ordered to be shipped in April alone meets the $5,000 threshold for the theft conviction.

8

## II

Sapatnekar contends that even if he ordered Graham to ship grain, no evidence indicates that he *personally* took, used, or transferred grain. He insists that the only conceivable basis for his guilt falls under an accomplice-liability theory, which was never part of the jury instructions. This instruction error, argues Sapatneker, requires a new trial.

Sapatnekar never requested the omitted instruction. We therefore review his assignment of error on appeal only under the plain-error standard. *State v. Griller*, 583 N.W.2d 736, 740 (Minn. 1998). We will consider reversing under this standard only if an error exists, the error is plain, and the error affected Sapatnekar's substantial rights. *See id.* Even if these three elements are met, we will reverse only if reversal is necessary "to ensure fairness and the integrity of the judicial proceedings." *Id.*

The state never accused Sapatnekar of aiding, abetting, assisting, or otherwise acting as an accomplice. We see no error in not including an accomplice-liability instruction when accomplice liability was never asserted. Sapatnekar's argument that he could be no more than an aider and abettor to his employee's theft nonetheless implies another challenge to the sufficiency of the evidence. The challenge fails.

Although a corporation's director is not ordinarily criminally liable for acts performed by the corporation's agents, he is criminally liable for his own acts if he participated in an unlawful scheme. *State v. Lux*, 235 Minn. 181, 187, 50 N.W.2d 290, 293 (1951). A corporate principal need not "actively participat[e] in the overt act constituting the primary offense" to incur criminal liability. *State v. Strimling*, 265

N.W.2d 423, 429 (Minn. 1978). And when a person acts through a corporation that "'he controls and dominates and which he has employed for that purpose,'" he cannot avoid criminal responsibility for those acts simply because he did them through the corporation. *State v. Williams*, 324 N.W.2d 154, 157 (Minn. 1982) (quoting *State v. McBride*, 215 Minn. 123, 131, 9 N.W.2d 416, 420 (1943)); *see also Kasner v. Gage*, 281 Minn. 149, 151 & n.3, 161 N.W.2d 40, 42 (1968) (observing that the court has customarily relied on a provision of the Restatement of Agency that assigns personal liability for the consequences of another's intentional conduct if the assignor intends the conduct or its consequences).

The direct and circumstantial evidence viewed in the light favorable to the verdict supports this finding: Sapatnekar made all the elevator's financial and operational decisions; he directed all its transfer and sale activities; he knew that the elevator possessed grain owned only by the farmers and not intended for sale (or grain owned by the farmers and intended for sale to benefit the farmers); and he ordered Graham to ship grain so that the company would receive cash that he intended to redirect to himself through corporate transfers. That is, he did not essentially aid, advise, hire, counsel, or conspire with another person so that he and the other person might commit a crime together. He instead directed his employee to take specific transfer and sales transactions that constituted a crime only because of Sapatnekar's exclusive intent to enrich himself from the transactions. He therefore did not aid another to commit a crime; he committed his own crime directly through his employment authority. So although Sapatnekar did not personally remove the grain from the elevator, load it into trucks, deliver it to purchasers,

10

and deposit cash from the purchasers into his own accounts, he directed the activity, essentially using the elevator's resources as agents and tools to accomplish the crime. The evidence therefore supports a finding that Sapatnekar is liable for the theft directly, not as an aider and abettor, by shipping the grain and withholding pay from the farmers while funneling the funds into his own account.

### III

Sapatnekar finally argues that the district court erroneously sentenced him to a stayed prison term of 366 days. He recognizes that the 366-day incarceration fits the guidelines presumptive felony sentence of one year and a day, *see* Minn. Sent. Guidelines IV (2010), but he maintains that the downward departure reflected in his original sentence was appropriate. A district court may depart downward from a guidelines sentence only if the case presents substantial and compelling circumstances atypical of the usual case. *State v. Kindem*, 313 N.W.2d 6, 7 (Minn. 1981). Durational departures depend on the manner in which the defendant committed his crime. *State v. Spain*, 590 N.W.2d 85, 88–89 (Minn. 1999). We will reverse a presumptive sentence only if the defendant argued valid reasons for downward departure and no countervailing reasons argue against departing, leaving no room for the district court to exercise discretion. *See Kindem*, 313 N.W.2d at 8. Sapatnekar cannot meet this standard.

Rather than finding that Sapatnekar's criminal conduct was less serious than the conduct in the typical theft case, the district court stated that "the offense was more serious than the typical theft charge." It explained that the "singular reason [that it] did not [originally] impose a felony level sentence was to 'give the defendant every

11

opportunity to pay these people back.'" It correctly recognized that its original sentencing reason does not justify a downward departure. And it confirmed that it did not find any offense-related factor that constitutes a mitigating basis for departure. It found that the offense was more serious than the typical $5,000 theft because of multiple victims and losses exceeding $100,000. Given the district court's unchallenged findings, it was bound to hold that no substantial and compelling circumstances supported its initial downward durational departure and to enter its corrected sentence.

**Affirmed.**